WILLIAM CRAMP & SONS SHIP & ENGINE BUILDING COMPANY v. INTERNATIONAL CURTIS MARINE TURBINE COMPANY ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 393.  Argued January 29, 30, 1918.—Decided March 4, 1918.

The Act of June 25, 1910, c. 423, 36 Stat. 851, providing, in part, that when patented inventions are used by the United States without license from the owner, or lawful right, the owner may recover reasonable compensation for such use in the Court of Claims, is not to be construed as automatically conferring a general license on the Government to use such inventions and as thereby authorizing their use at the will of private parties in the manufacture of things to be furnished under contracts between them and the United States.

Where, therefore, a company entered into a contract with the United States to build certain vessels which was based on specifications, submitted or approved by the Navy Department, covering in detail the structure, engines, etc., but which contract expressly provided for protecting the Government against any claims which might arise from the infringement by the contractor of the rights of any patentee; and in constructing the vessels installed therein certain patented engines without the consent of the patent owners; *held*, that the Act of June 25, 1910, *supra*, did not operate to relieve the contractor from liability to account for the damages and profits arising from the infringement.

The purpose of the statute is to give further security to the rights of patentees by permitting suit and recovery of compensation in the Court of Claims in those cases where their inventions are availed of for the benefit of the United States by officials of the Government, in dealing with subjects within the scope of their authority, but under circumstances not justifying the implication of contract with the patentees. Aside from exceptional cases where the authority of the United States to take under eminent domain may be said to be exerted in reliance upon this provision for compensation, the act contemplates the possibility of official error or mistake in the invasion of such rights; it does not contemplate the deliberate and wrongful appropriation of such constitutionally protected property by official authority, much less does it intend that mere contractors with the Government may make such appropriations without compensation, in the work under their contracts, upon the assumption that the United States ultimately will be liable under the statute for the rights so elected to be taken.

*Crozier* v. *Krupp*, 224 U. S. 290, explained and distinguished.

238 Fed. Rep. 564, affirmed.

THE case is stated in the opinion.

*Mr. Clifton V. Edwards* and *Mr. Abraham M. Beitler* for petitioner:

*Crozier* v. *Krupp*, 224 U. S. 290, was not decided upon the basis of Crozier being an officer upon salary who derived no pecuniary benefit from the infringement, but with the understanding that that fact became immaterial when Congress passed the Act of June 25, 1910. The transaction was treated as in effect a licensed one; hence

there could be no injunction. The court held, by implication, that there can be no accounting in such a case, for the only theory upon which accounting can be ordered in any patent suit is the theory that defendant is an infringer. If an individual making devices for the Government is not an infringer there is no basis for a decree for either an accounting or an injunction.

If the taking by the Government is under eminent domain, then it follows that the status of the Government is that of a rightful user, in effect a licensee, and the status of the Cramp Company is that of a maker for the licensee, protected by the license. The language of the act makes it applicable to cases where an "invention" is "used," thus not confining it to the mere use of a machine. An invention is used when a machine or composition of matter is either made or used or sold, or when a process is practiced. That the language of the act is broad enough to cover the making of a machine was decided in *Crozier* v. *Krupp* because in that case the matter in dispute was the making of field guns, by Crozier, and not their use by the Government, and the opinion (p. 306) refers to the purpose of the act being to avoid "interference with the right of the Government to make and use." Even if the statute had employed the word "use" in the narrow sense of use of a machine, that would carry with it the implied right to have the machine made. *Illingworth* v. *Spaulding*, 43 Fed. Rep. 827, 830; *Woodworth* v. *Curtis*, 2 Woodb. & M. 524; *Steam Stone-Cutter Co.* v. *Shortsleeves*, 16 Blatchf. 381; *Porter Needle Co.* v. *National Needle Co.*, 17 Fed. Rep. 536; *Dunlop Pneumatic Tyre Co., Ltd.,* v. *North British Rubber Co., Ltd.*, British Patent Trade-Mark Cases, vol. 21, p. 161, 173. It is pertinent to note that the above cases expressly recognized the right of the licensee to have the device made for him by others than himself. To the same effect is *Montrose* v. *Mabie*, 30 Fed. Rep. 234. And the cases above cited expressly state the im-

munity of the maker for the licensee.   *Thomson-Houston Co.* v. *Ohio Brass Co.,* 80 Fed. Rep. 720; *Johnson Railroad Signal Co.* v. *Union Switch & Signal Co.,* 55 Fed. Rep. 487.

The fact that the defendant may make a profit out of the making was not a violation of the appellee's (plaintiff's) rights, and the plaintiff is not entitled to a profit on the manufacture.   The right to such profit passed with the license, irrespective of the individual who might do the work.   What is implied in the statute is as much a part of it as what is expressed.   *Gelpcke* v. *Dubuque,* 1 Wall. 220; *Wilson* v. *Bank,* 103 U. S. 770; *Brooks* v. *United States,* 39 Ct. Clms. 494.

The vital question in this case is whether defendant's action is non-infringing or infringing in character.   It is absurd to confuse this with the question of whether defendant has made a profit.   If the Government is not an infringer, defendant is not liable to an infringement suit, whether it made profit or not. If this court, having decided that the Act of 1910 protects Crozier, an officer of the Government, should now decide that it does not protect the Cramp Company, a contractor with the Government, it must be evident that many intermediate cases will constantly be arising as to which the line will have to be drawn again and again.

An examination of previous cases in the Court of Claims, the Circuit Courts of Appeal, and the Supreme Court shows that the operation of the prior statute law resulted in injustice to patentees in depriving them of compensation for the appropriation of their inventions by the Government, its officers, agents, etc., and in annoyance and harassment of the Government and those dealing with it in the resulting attempts to do indirectly that which could not be done directly.   The Government was seriously hampered in respect of its enjoyment of necessary inventions, while patentees, if unable to prove a contract, were

often without relief. So far as we can find, in no case prior
to the passage of the Act of 1910 was any officer or con-
tractor actually enjoined or compelled to pay personal
profits or damages by reason of the infringement of a
patent as a necessary incident to government work. At
best, the right even against a contractor was challenged
and uncertain. Numerous decisions prior to the act,
among them *Dashiell* v. *Grosvenor*, 66 Fed. Rep. 334, had
ruled squarely against the right, and this court as late as
1896, in affirming that case, reserved the question. 162
U. S. 425, 434. Numerous cases in the Court of Claims
illustrate the Government's extensive use of patents and
the difficulties of patentees in getting jurisdiction. And
many cases in this and other federal courts show how un-
successful had been the attempts to obtain injunctive or
other relief against officers and contractors. In none of
the reported cases is a distinction drawn between an
officer and a contractor. Since the right to equitable re-
lief depends upon jurisdiction for the purpose of granting
an injunction (*Root* v. *Railway Co.*, 146 U. S. 210), no one
had succeeded in collecting any profits or damages from
either.

The act meets the situation by writing what is in effect
a license agreement between the Government and the
patentee. It gives an additional remedy to the patentee—
a substantial remedy; it provides that he shall recover
compensation, whereas before he could not do so. An
object of equal importance was to insure that the Govern-
ment should be free and uninterrupted in its use of pat-
ented inventions. As the Government must always act
through its officers and agents, and has customarily carried
on a large part of its work through contractors, it is ob-
vious that duly authorized use by these instrumentalities
without interference was contemplated by the act. There
would have been no object for the Government to pay for
the use of an invention, if that payment did not cover the

whole transaction and protect those carrying on the work for the Government.

License agreements may expressly reserve the right to the licensee to contest validity. In the present instance it is as if the Government took a license under such valid patents as it uses. Of course, an express license to use the valid patents of the licensor would not bar the licensee from showing that a particular patent asserted by the licensor was invalid. Under the Constitution, Congress can give inventors an exclusive right, or it can give them no right at all; we submit that the reasonable view is that it can confer some right intermediate between these extremes.

The views of the House Committee are inadmissible; but the report also shows an intention to give the Government the right to appropriate inventions.

When the Government bound itself and the Cramp Company by the execution and delivery of the contracts, the appropriation was made. Those contracts referred to certain plans, specifications and drawings for the turbines. It is not necessary to an appropriation under the right of eminent domain that it should be primarily and explicitly directed to the object taken. If the act is no protection to a contractor following government specifications, then it follows that any patent owner may enjoin contractors from using their patents in following those specifications—an unthinkable result in these times. A final decree of compensation against the United States would be an adjudication that the Government was a wrongdoer in making use of the patented invention, and it would be the duty (at least the moral duty) of the executive branch to cease such wrongdoing.

*Mr. Frederick P. Fish,* with whom *Mr. Charles Neave* and *Mr. William G. McKnight* were on the brief, for respondents, went minutely into the construction of the statute

and distinguished *Crozier* v. *Krupp*, 224 U. S. 290. Of that case it was said, in part: The court did not decide that the rights and remedies of the patent owner as against private individuals making a private profit have been in any way altered by the act, but merely that suits based on infringement by a government officer acting solely in his public capacity and for the public benefit, can no longer be brought against that officer. The Government, by the Act of 1910, has assumed responsibility for his wrong. That is, the wrongful act of the officer is committed by the authority of the Government, and it ceases to be wrongful so far as the officer is concerned; the Government assumes responsibility and, by virtue of the Act of 1910, recognizes its liability. We do not understand that this court held that the Government's wrong became a right by the Act of 1910, though "in substance," as the court says, it is in the position which, as between individuals, would be the equivalent of that of a licensee in that its appropriation of a patented invention cannot be stopped. It is in this sense, and this sense only, that we understand the court's reference to eminent domain and to the "appropriation of a license." Those expressions are used only when considering the situation "in substance"—"looking at the substance of things"—"the substantial result of the statute." They are illustrative, rather than descriptive, of the legal situation. The Government had, and has, a right to make use of patented inventions, and of any other private property, in the sense that it has the power to do so, and cannot be prevented from exercising that power, as it has never consented to any limitation thereon. Here the defendant, a private corporation, has made a personal profit from its infringement of the plaintiff's patent rights. The plaintiff now seeks to recover from it—not from the Government—that personal profit unlawfully obtained. No such situation was presented in *Crozier* v. *Krupp*.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The history of this suit from its commencement up to the development of the controversy now before us, will be shown by an examination of the decided cases referred to in the margin.[1] We shall therefore not recur to that which has gone before but confine our statement to the things essential to an understanding of the phase of the issue which we must now decide.

Under proposals submitted by the Navy Department the petitioner, the Cramp Company, in 1908 contracted to build two torpedo boat destroyers, Nos. 30 and 31, and in 1911 further contracted to build four such boats, Nos. 47, 48, 49 and 50. The specifications submitted by the department as to structure, engines, etc., were comprehensively detailed and the contracts were based either upon the acceptance of such specifications or upon such changes suggested by the contractor as met the approval of the Navy Department. The contracts contained an express provision, which is in the margin,[2] protecting the Govern-

---

[1] *International Curtis Marine Turbine Co.* v. *Wm. Cramp & Sons Co.*, 176 Fed. Rep. 925; *In re Grove*, 180 Fed. Rep. 62; *International Curtis Marine Turbine Co.* v. *Wm. Cramp & Sons Co.*, 202 Fed. Rep. 932; *Wm. Cramp & Sons Co.* v. *International Curtis Marine Turbine Co.*, 228 U. S. 645; *International Curtis Marine Turbine Co.* v. *Wm. Cramp & Sons Co.*, 211 Fed. Rep. 124; *Wm. Cramp & Sons Co.* v. *International Curtis Marine Turbine Co.*, 234 U. S. 755.

[2] "PATENTS. The party of the first part, in consideration of the premises, hereby covenants and agrees to hold and save the United States harmless from and against all and every demand or demands of any nature or kind for or on account of the adoption of any plan, model, design or suggestion, or for or on account of the use of any patented invention, article, or appliance that has been or may be adopted or used in or about the construction of said vessel, or any part thereof, under this contract, and to protect and discharge the Government from all liability on account thereof, or on account of the use thereof,

ment against any claims which might arise from the infringement by the contractor of the rights of any patentee, if any such rights there were.

The Turbine Companies filed their bill against the Cramp Company to recover damages and profits accruing from the infringement of certain patents on turbine engines which the Cramp Company had placed in the boats built under the contract of 1908. Ultimately this claim of infringement was upheld by the Circuit Court of Appeals for the Third Circuit. 211 Fed. Rep. 124. On the hearing which then ensued before a master as to damages and profits, the Turbine Companies urged their claim and tendered their proof concerning the same, covering the four destroyers, Nos. 47, 48, 49 and 50, built under the contract of 1911, upon the ground of an infringement like that which had been committed as to the boats built under the contract of 1908. *Rubber Co.* v. *Goodyear,* 9 Wall. 800. The inquiry was objected to on the ground of its irrelevancy because liability for infringement under the contract of 1911 was to be tested by a different rule from that which was applicable to the boats contracted for in 1908 in consequence of the applicability to the 1911 contracts of the Act of Congress of June 25, 1910, c. 423, 36 Stat. 851. Under that law, it was insisted, "the United States, by act of eminent domain, acquired a license to use the invention of all existing patents, and, therefore, the transactions under the contracts for torpedo boat destroyers Nos. 47, 48, 49 and 50, being merely the building of devices for a licensee under the patent in suit, were licensed transactions and not infringing transactions, and consequently are not within the scope of this accounting." The master overruled the objection but thereafter on request certified the subject to

by proper releases from patentees, and by bond if required, or otherwise, and to the satisfaction of the Secretary of the Navy."

the District Court where his ruling was held to be wrong on its merits and reversed. On a rehearing the court sustained the view which it had previously taken of the subject by a reference to a decision of the Circuit Court of Appeals for the Second Circuit (*Marconi Wireless Telegraph Co.* v. *Simon*, 227 Fed. Rep. 906; 231 Fed. Rep. 1021). 232 Fed. Rep. 166. Application was then made to the Circuit Court of Appeals by certiorari to review this ruling and by mandamus to compel the master to proceed with the hearing in accordance with the claims of the Turbine Companies. Finding that the ruling in the *Marconi Case* was pending in this court for review, the Court of Appeals postponed deciding the issue of statutory construction to await the decision of this court, but directed the accounting to proceed as to both classes of contracts in such a manner as to enable the authoritative ruling on the statute when made by this court to be applied without confusion or delay. 238 Fed. Rep. 564. The writ of certiorari on which the case is now before us was then allowed and this and the *Marconi Case* referred to by the court below were argued and submitted upon the same day.

The single question is, did the provisions of the Act of 1910 operate without more to confer upon the United States a license to use the patents of the Turbine Companies; and if so, was the Cramp Company as a contractor authorized to avail itself of the license by using the patent rights of the Turbine Companies without their consent? Avowedly on the very face of the act its purpose was not to weaken the rights of patentees, but to further secure them. This results not only from the title of the law (An Act to provide additional protection for owners of patents of the United States, and for other purposes), but further from the report of the committee of the House of Representatives where the act originated which stated that such was the purpose intended to be accomplished

by the act. (House Report No. 1288, 61st Cong., 2d·
sess.). The conflict between the purpose thus intended
and the construction now claimed for the act is evident
unless it can be said that to confer by anticipation upon
the United States, by a law universally and automatically·
operating, a license to use every patent right is a means of·
giving effect to a provision of a statute avowedly intended
for the further securing and protecting of such patent rights.

But passing deducing the meaning of the act from its
title and the report of the committee by which it was
drafted, it is apparent that the significance which the con-
tention affixes to it is directly in conflict with the text
(which is in the margin [1],) since that text expressly de-
clares that the object of the act is to secure compensation
for patentees whose rights have been "used by the United
States without license"—the very antithesis of a right
by license to use all patents which is the purpose attrib-

---

[1] "An Act To provide additional protection for owners of patents
of the United States, and for other purposes.

"*Be it enacted by the Senate and House of Representatives of the United
States of America in Congress Assembled,* That whenever an invention
described in and covered by a patent of the United States shall here-
after be used by the United States without license of the owner thereof
or lawful right to use the same, such owner may recover reasonable
compensation for such use by suit in the Court of Claims: *Provided,
however,* That said Court of Claims shall not entertain a suit or re-
ward (*sic*) compensation under the provisions of this Act where the
claim for compensation is based on the use by the United States of any
article heretofore owned, leased, used by, or in the possession of the
United States: *Provided further,* That in any such suit the United States
may avail itself of any and all defenses, general or special, which
might be pleaded by a defendant in an action for infringement, as set
forth in Title Sixty of the Revised Statutes, or otherwise: *And pro-
vided further,* That the benefits of this Act shall not inure to any pat-
entee, who, when he makes such claim is in the employment or service
of the Government of the United States; or the assignee of any such
patentee; nor shall this Act apply to any device discovered or invented
by such employee during the time of his employment or service."

uted to the act by the argument. And this is made clearer by considering that the statute itself in directing the proceedings which must be resorted to in order to accomplish its avowed purpose, exacts the judicial ascertainment of conditions which would be wholly negligible and irrelevant upon the assumption that the statute intended to provide in favor of the United States the general license right which the argument attributes to it. This conclusion cannot be escaped when it is considered that if the license, which it is insisted the act in advance created, obtained in favor of the United States, the inquiry into the question of infringement by the United States for which the statute provides would be wholly superfluous and indeed inconsistent with the assumption of the existence of the supposed license.

But let us in addition pass these latter considerations and come not only to demonstrate the error of the construction asserted but to make manifest the true meaning of the statute from a twofold point of view, that is, first, from an analysis of the context of the statute as elucidated by the indisputable principles which at the time of the adoption of the act governed the subjects with which it dealt, and, second, from the consideration of the context and the effect upon it of the ruling in *Crozier* v. *Krupp,* 224 U. S. 290.

At the time of the enactment of the law of 1910 the following principles were so indisputably established as to need no review of the authorities sustaining them, although the leading cases as to all the propositions are referred to in the margin.[1]

(a) That rights secured under the grant of letters pat-

---

[1] *United States* v. *Palmer,* 128 U. S. 262; *Schillinger* v. *United States,* 155 U. S. 163; *United States* v. *Berdan Fire-Arms Mfg. Co.,* 156 U. S. 552; *Belknap* v. *Schild,* 161 U. S. 10; *Russell* v. *United States,* 182 U. S. 516; *International Postal Supply Co.* v. *Bruce,* 194 U. S. 601; *Harley* v. *United States,* 198 U. S. 229.

ent by the United States were property and protected by
the guarantees of the Constitution and not subject there-
fore to be appropriated even for public use without ade-
quate compensation.

(b) That although the United States was not subject
to be sued and therefore could not be impleaded because
of an alleged wrongful taking of such rights by one of its
officers, nevertheless a person attempting to take such
property in disregard of the constitutional guarantees
was subject as a wrongdoer to be controlled to the extent
necessary to prevent the violation of the Constitution.
But it was equally well settled as to patent rights, as was
the case with all others, that the right to proceed against
an individual, even although an officer, to prevent a vio-
lation of the Constitution did not include the right to dis-
regard the Constitution by awarding relief which could
not rightfully be granted without impleading the United
States, or, what is equivalent thereto, without interfer-
ing with the property of the United States possessed or
used for the purpose of its governmental functions.

(c) That despite the want of authority to implead the
United States, yet where an officer of the United States
within the scope of an official authority vested in him to
deal with a particular subject, having knowledge of ex-
isting patent rights and of their validity, appropriated
them for the benefit of the United States by the consent
of the owner, express or implied, upon the conception that
compensation would be thereafter provided, the owner of
the patent right taken under such circumstances might,
under the statute law of the United States permitting
suits against the United States on contracts express or
implied, recover by way of implied contract the compensa-
tion which might be rightly exacted because of such taking.

(d) That where an officer of the United States in deal-
ing with a subject within the scope of his authority in-
fringed patent rights by a taking or use of property for

the benefit of the United States without the conditions stated justifying the implication of a contract, however serious might be the infringement or grave to the holder of the rights the consequences of such infringement, the only redress of the owner was against the officer, since no ground for implying a contract and securing compensation from the United States obtained.

Coming to consider the statute in the light of these principles, there would seem to be no room for controversy that the direct and simple provision, "that whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims," embraces and was intended alone to provide for the discrepancy resulting from the divergence between the right in one case to sue on an implied contract and the non-existence of a right to sue in another. And this meaning becomes irresistible when the concordance which it produces between the title and the report of the committee is considered on the one hand, and the discord which would arise on the other from reading into the statute the theory of automatic and general license as to every patent which the argument presses. Observe that the right to recover by implied contract as existing prior to 1910 and the right to recover given by that act both rest upon the possession and exertion of official authority, although from the absence of definition in the statute the precise scope of the official power possessed in order to bring the authority into play is not specified but is left to be deduced from the application of general principles. Observe further that, resting thus upon the exercise of official power, it was not assumed before the Act of 1910 or under that act, that the official authority would consciously and intentionally be exerted so as to violate the Constitution

by wrongfully appropriating private property. This follows from a twofold point of view: First, because the basis of the right to sue on implied contract is the fact that official power, recognizing the patent right and the at least implied assent of the owner, had acted in reliance upon the fact that adequate compensation would follow the taking. And second, because, in conferring the right to prove infringement, the Act of 1910 obviously contemplates the possibility of the commission of official error or mistake on that subject and afforded a remedy for its correction and resulting compensation. Thus it is true to say that under both views the theory of universal and automatic appropriation by the United States of a license to use all patent rights is unsupported, since both views assume that official authority would not be wilfully exerted so as to violate the Constitution, and this although it be that the Act of 1910 embraces the exceptional case where, because of some essential governmental exigency or public necessity, the authority of the United States is exerted to take patent rights under eminent domain in reliance upon the provision to recover the adequate compensation which the Act of 1910 affords. And this fundamental characteristic at once exposes the want of foundation for the contention that because the statute made provision for giving effect to acts of official power in taking patent rights under the conditions stated and even when necessary of curing defects in the exertion of such power, therefore it is. to be assumed that the statute conferred upon all who contracted with the United States for the performance of work a right to disregard and take without compensation the property of patentees. This must be, since the making of a contract with the United States to perform duties in favor of the United States does not convert the contractor into an official of the United States qualified to represent it and to entail obligations on it which under the terms of the statute can alone rest

upon official action and the discharge of official duty. The making of a contract with the United States and the resulting obligation to perform duties in favor of the United States by necessary implication impose the responsibility of performance in accordance with the law of the land; that is, without disregarding the rights or appropriating the property of others. A contractor with the United States, therefore, is in the very nature of things bound to discharge the obligation of his contract without violating the rights of others, and merely because he contracts with the United States is not vested with the power to take the property of others upon the assumption that as a result of the contract with the United States he enjoys the right to exercise public and governmental powers possessed by the United States.

Nor is there any foundation for the assumption that the ruling in *Crozier* v. *Krupp*, 224 U. S. 290, is in conflict with these self-evident propositions and by necessary implication sanctions the theory of universal license in favor of the United States as to all patent rights and the asserted resulting authority in contractors with the United States for the purpose of the execution of their contracts to disregard and appropriate all such rights.

Stated as briefly as we possibly can, the case was this: In the arsenals of the United States guns and gun carriages were constructed containing appliances which it was asserted infringed patent rights of the Krupp Company. A bill was filed against Crozier, who was Chief of Ordnance of the United States, to enjoin the alleged violation of the asserted patent rights. Crozier demurred to the amended bill on the ground that the court had no jurisdiction because the suit was one against the United States. The trial court dismissed the bill. The Court of Appeals of the District of Columbia reversed because, although it fully conceded there was no jurisdiction over the United States and no power to interfere with its pub-

lic property or duties, it yet considered that there was
jurisdiction to restrain the individual, although an officer,
from continuing to take property without compensation
in violation of the Constitution. A certiorari was granted.
It was stipulated in the cause that the structures com-
plained of had been made in all the arsenals of the United
States by Crozier, the Chief of Ordnance, and by the
United States, and that the United States had asserted
the right, and proposed to continue, to make the guns and
gun carriages in the future for its governmental purposes
and denied the violation of any patent right. It was also
stipulated that the Chief of Ordnance had made no prof-
its and that all claims were waived except the claim of
right to a permanent injunction at the termination of the
suit to prevent the use of the appliances in the future. And
that was the solitary issue which here arose for decision.

It was held that in view of the admission as to the na-
ture and character of the acts done by the United States
and further in view of the power of the United States to
take under eminent domain the patent rights asserted,
the provisions of the statute affording a right of action
and compensation were adequate to justify the exercise
of such power. In accordance with this ruling it was de-
cided that there was no right to an injunction against the
Chief of Ordnance as an individual and the parties if their
rights had been infringed were relegated to the compensa-
tion provided under the Act of 1910. In reaching this
conclusion the statute was critically considered princi-
pally for the purpose of determining whether the right to
recover compensation which the act afforded was ade-
quate to fulfill the requirements of compensation for
rights taken as protected by the Constitution. It is true
in the analysis which was made of the statute for this pur-
pose it was said that the consummated result of the Act
of 1910 in any particular case was to confer upon the
United States a license to use the patent right (p. 305).

But the use of the word "license" affords no room for holding that it was decided that the statute provided for the appropriation by anticipation and automatically of a license to the United States to use the rights of all patentees as to every patent. And clearer yet is it that the use of the word "license" affords no ground for the proposition that the statute invested every person contracting with the United States for the furnishing of material or supplies or for doing works of construction with public powers and transferred to them the assumed license to violate patent rights to the end that they might be relieved of the obligations of their contracts and entail upon the United States unenumerated and undetermined responsibility upon the assumption that the United States would be ultimately liable for the patent rights which the contractors might elect to take. Through abundance of precaution, however, we say that if any support for such contentions be susceptible of being deduced from the use of the word "license" in the passage referred to, then the word must be and it is limited, as pointed out by the context of the opinion and by what we have said in this case, to the nature and character of use which was contemplated by the statute and which is consonant with the execution of its limited though beneficent purpose and not destructive of the same.

Under the view which we have stated it follows that the court below did not err in ordering the accounting under the 1911 contracts to proceed so that the statute when correctly construed might be applied. To the end, therefore, that effect may be given to such accounting as ordered by the court below our decree will be

*The order of the Circuit Court of Appeals to the extent that it directed the accounting to be made on the basis therein stated is affirmed and the decree of the District Court is reversed and the case is remanded to the District Court for further proceedings in conformity with this opinion.*