CHURCHWARD INTERNATIONAL STEEL CO. v. BETHLEHEM STEEL CO. (CARNEGIE STEEL CO., Intervener).

(District Court, E. D. Pennsylvania.   October 30, 1919.)

No. 1491.

1. RELEASE &#8750;&#8211;33—SCOPE OF ACQUITTANCE FOR INFRINGEMENT.
    An acquittance given one company for infringement of patent in manufacturing and selling up to a certain quantity construed as also acquitting its licensees and vendees.

2. PATENTS &#8750;129—ATTACK ON VALIDITY BY LICENSEE.
    Validity of a patent may not be questioned by one asserting license to operate under it.

3. TRIAL &#8750;387(3)—RULING ON QUESTION NOT MATERIAL TO CASE NOT NECESSARY.
    Whether a defendant, setting up a license to make up to a certain quantity under a patent, may as to the excess deny validity of the patent, will not be decided; it not being essential to a decision of the cause, and plaintiff not asking that the case be ruled on that point, but merely characterizing defendant's position as advanced with ill grace.

4. PATENTS &#8750;49—EVIDENCE OF UTILITY.
    That a patented process for manufacturing steel was used, and that a large manufacturer, through its officers, having the fullest knowledge of the science and art and having at their command the best experts, paid a large sum for infringement and right to use, is strong evidence of utility.

5. PATENTS &#8750;45—LETTERS PATENT SUFFICIENT EVIDENCE TO SHOW VALIDITY AS AGAINST CLAIM OF NO ADVANCE ON PRIOR ART.
    Letters patent, pertaining to a most important art, are prima facie evidence sufficient, in the absence of controlling evidence to the contrary, to support a finding of validity against a claim of no advancement on what was within the common knowledge of all familiar with the metallurgical science.

In Equity. Bill by the Churchward International Steel Company against the Bethlehem Steel Company; the Carnegie Steel Company

&#8750;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

intervening as a defendant. Sur trial hearing on bill, answer, and proofs in suit for infringement of letters patent Nos. 845,756 and 868,-327. Decree for plaintiff.

See, also, 233 Fed. 322.

Charles H. Duell, Frederic P. Warfield, and Holland S. Duell, all of New York City, for plaintiff.

Fraley & Paul, of Philadelphia, Pa., and Charles Neave and Clarence D. Kerr, both of New York City, for defendant.

R. V. Lindabury, of Newark, N. J., Henry P. Brown, of Philadelphia, Pa., and D. Anthony Usina, of New York City, for intervener

DICKINSON, District Judge. In view of the interval between the commencement of this suit and the final hearing, it may be well to say a word in explanation, if not in justification, of the delayed trial of the cause. The bill was filed October 29, 1915, and was ready to be heard May 28, 1917. The complaint involves a charge of trespass upon the claimed patent rights of the plaintiff in the making of what are termed alloyed steels. The metal was made in part for the use of the United States, and the question arose of whether the rights of the plaintiff could be asserted in the manner sought to be asserted for such use of the patented product. The very question, or the general question involving it, which thus arose in the cause, was then before, or about to be presented, to the Supreme Court of the United States for determination. It was thought well, in view of this, to defer the trial of this cause until that question was determined, in the hope that when it was determined the parties would be able to adjust their differences. This has proven to be a "hope deferred," because, although the suggested question has been determined, it has not disposed of the cause, and it comes now before the court upon final hearing. Marconi v. Simon, 246 U. S. 46, 38 Sup. Ct. 275, 62 L. Ed. 568; Cramp v. Curtis, 246 U. S. 28, 38 Sup. Ct. 271, 62 L. Ed. 560.

In the view of counsel the following questions are involved:

(1) What effect the dealings between the plaintiff and the Carnegie Steel Company, the intervening defendant, and the agreements entered into between them, has upon the right of the plaintiff to recover against the Bethlehem Steel Company, defendant, for what would otherwise be a trespass upon the plaintiff's patent rights.

(2) Whether the interposition of the claim to a license or release of damages prevents the defendant from questioning the validity of the plaintiff's rights.

(3) The utility of the thing patented and the (in other respects) validity of the patents in view of the state of the art and of the accomplishments and practices of steel makers at the time the patentee developed the combination which enters into his make of metals; the question involving also what contribution the patentee had made to the art and the question of double patenting.

The suggested questions 1 and 2 arose out of this state of facts:

The plaintiff owned or controlled, not merely the letters patent here directly involved, but also patents which had been issued in other countries. The Carnegie Steel Company was charged by the plaintiff with a trespass upon the proprietary rights given by the United States

patents. This charge of trespass was withdrawn in pursuance of an agreement entered into between the plaintiff and the Carnegie Company, which was reduced to writing and executed by the parties to it. The consideration moving to the plaintiff was the payment of the substantial sum of $275,000, for which the Carnegie Company was given an acquittance of all claims of damages or otherwise for any trespass in this respect upon the rights of the plaintiff of which the Carnegie Company may have been guilty. The Carnegie Company was further given a license to operate under the foreign patents of the plaintiff, and the still further right to operate under the United States patents; such latter operation to be limited to the production of war materials.

It should be interpolated here, to make clear the scope of the subject-matter of the agreement, that the Carnegie Company had not merely manufactured and used what was averred to be an infraction of plaintiff's patent rights, but they had sold to others, who had themselves used, so that there was the charge of infringement, both direct and contributory. The acquittance was in consequence extended to include the licensees and vendees of the Carnegie Company.

This agreement has been set up directly by the Carnegie Steel Company as an intervening defendant interested in the cause, for the reason that it had warranted to its vendees and licensees the right to make, vend, and use that with which the Carnegie Company supplied them and had authorized them to make. The agreement is also set up as a bar by the Bethlehem Steel Company on the several theories which, for the purpose of the presentation of the question now being made, it is unnecessary to further set forth.

On the other hand, the doctrine is invoked by the plaintiff in support of its patent rights that the validity of a patent cannot be questioned by one who is operating under it through a license from the patentee. Hence it is that questions 1 and 2 arose. An attempt was made (now abandoned) to reform the agreement thus pleaded, by rewriting it, so as to expressly except out of its provisions the Bethlehem Steel Company and other companies.

It is conceded, as we further understand it, that this branch of the defense is limited to 600 tons of the total tonnage which is complained of by the plaintiff as a trespass upon its rights. If this release, license, or agreement, whatever it may be termed, operates to prevent the plaintiff from being successful in the assertion of its complaint, this branch of the defense is limited to this 600 tons. It leaves, however, of course, in the case the effect of such a defense upon the other question of whether the defendants are free to attack the validity of the patents.

[1] We do not deem it necessary to do more than state the conclusion reached with respect to this defense, so far as it is a defense. The attempt to rewrite the agreement having been abandoned, we must construe the agreement as it is written, and the construction given it is that it operates to acquit, not merely the Carnegie Steel Company, but the Bethlehem Steel Company of all right of recovery with respect to these 600 tons.

[2] So far as the effect of the pleading of this release or license affects the other question of the right of the lessee or licensee to attack the validity of patent rights, of which the Carnegie Steel Company are pro tanto asserting themselves to be owners, we are further of opinion that that company is within the doctrine invoked, and as a consequence cannot be permitted to be heard to deny validity.

[3] This leaves in that branch of the case only the question of whether the Bethlehem Steel Company is also within the application of the same doctrine. Inasmuch as the Bethlehem Steel Company, in asserting the rights of the Carnegie Steel Company, has made use of the paper referred to as a mantle of protection, it was urged at the argument at bar, on behalf of the plaintiff, that it must be visited with all the consequences of shielding itself under such protection. This was met by the Bethlehem Steel Company with the assertion that the definite ruling has been made that it may set up the defense of such a release or such a license without prejudicing its right to attack the validity of the patents, when charged by the patentee with an independent trespass by the Bethlehem Steel Company upon the patent rights asserted.

The case of Symington v. National (D. C.) 257 Fed. 564, and others, are cited as decisive of this question. It is to be observed that the Symington Case and the supporting rulings quoted in the opinion in that case plant the ruling made upon a fact situation which does not here exist.

The cases relied upon present the question of whether a defendant, who has accepted a license to manufacture one thing, which is asserted by the licensor to be within the claims of his patent, is estopped from making another and different thing merely because this second thing is also claimed by the patentee to be covered by the claims of his patent. The ruling made was that he is not so estopped. The fact situation here, however, is different, and in consequence the question presented differs from the one ruled. Here the question is whether a defendant, who has infringed the patent rights of the plaintiff by making something which it is the exclusive right of the plaintiff to make, is permitted to defend by setting up a license to make up to a limited quantity of the product, and as to the remainder to deny the validity of the patents under which he has been exercising the right to make.

We do not find, however, from the brief of the plaintiff, that the plaintiff relies upon the doctrine above suggested, nor is the court asked to declare and apply that doctrine to the facts of this case. Counsel for plaintiff seems to have contented himself with characterizing the position of the Bethlehem Steel Company as one advanced "with ill grace." Unless the logical necessities of a ruling of the case call upon the court to rule it upon a point or points not advanced by counsel, it is usually the part of practical wisdom not to so rule it.

Counsel engaged in this cause have had much more time and a very much better opportunity to analyze the case and its defense than the trial judge could possibly have, and we have that measure of confidence in the judgment of the able counsel who represent the respective par-

ties to accept what they deem to be its ruling points, and inasmuch as we are not asked to rule the case upon this point, and it is not essential to a decision of the cause, we leave the point as presented without a decision and without further discussion.

[4, 5] Upon the third question suggested, we have the following alignment of opposing views: The plaintiff relies largely and practically wholly upon the prima facie case, evidenced by the grant of the letters patent, and upon what the plaintiff regards to be the weakness of the attack made upon its rights, and asks for a finding that its patents are valid. There is no question of infringement.

Counsel for defendant deny the validity of the patents on a number of grounds, among which it is sufficient to enumerate those following: One is that the patentee made no contribution to the art, in that every substantial thought, at least every one which is definite enough to be grasped and comprehended, was a thought already well known to all who were informed as to the state of the metallurgical art, and was one which could be readily found in the literature of that art. Another ground is in large measure the same viewed in a somewhat different aspect. It is a denial of utility, in that all that was useful or helpful in the art, as disclosed in the patentee's applications and claims, was already among the possessions of the art, and that the only contribution which the patentee made was his idea of the proper relative quantity of the different metals which should go into the production of alloyed steel, and that a steel manufactured in accordance with the ingredients proposed by the patentee, and in the proportions suggested by him, was a product of no value to steel producers or users. Still another ground is that the second patent is in all essential respects the same as the first patent, except in the particular that one is an overlapping of the other, in the sense of being a mere extension of the quantitative range of the metals used in getting the product.

However much the very strong argument in support of the attack upon the validity of these patents might make upon the mind, if the defendants had done nothing more than do what is charged to be an infringement, we do not feel called upon to declare. Each and both of these defendants have had more than this to do with the patented product and with the patentee. This is emphasized in the case of the Carnegie Steel Company.

One ground of invalidity urged, and that very strongly, is that steel made in accordance with the patented process is without value. Some opinion evidence has been given in support of this denial of utility. It would be a bolder finding to make than we care to make, however, that something which at the very least was urged as a lever to pry $275,000 out of the grasp of the Carnegie Steel Company was something which was of no use. As has been repeatedly observed, an infringer is in the worst possible position to raise a question of the utility of that which he has without authority used. The query cannot be repressed, "If the thing is of no use, why did you make use of it?" We have the fact that the Carnegie Company were charged with the infringement of these patents; the further fact that the company paid $275,000 to escape the consequences of infringement, and the right to

manufacture under these patents to a limited extent; and the still further fact that afterwards, and after the infringement now complained of, they sought to buy the right to manufacture under these letters patent. We have in mind that there was included in the $275,000 payment the sale of the foreign patents, and that their request for a second license was after they had committed themselves by accepting the first license. We have the additional circumstance that the officers who negotiated for these licenses were men having the fullest knowledge both of the science and the art which had to do with this product, and that they had at their command the services of the best experts the world could produce. It may be that the real object they had in view in the first negotiation was an ulterior one, and was neither limited to nor did it have in view the question of value in these patents. We do not lose sight of the fact that what was paid included the purchase of the foreign patents, and that the Carnegie Company might have been willing to pay the whole sum paid for these patents, and attached no value to the United States patent.

We are not concerned at present, however, with any other question than the utility of the thing patented, and the payment of a large sum of money by a party to a cause of any patent granting the exclusive right to manufacture and sell a thing is evidence, and indeed evidence hard to overcome, that the thing patented was useful, whether the United States patents were of any value or not. Why should any one want the patent rights (irrespective of where the patents were issued) to make something which was not worth the making? What the Carnegie Company did in this respect is evidence, and indeed direct and persuasive evidence, of utility. It is not in the same sense, if indeed at all, evidence in the respect of being a reason for finding validity. Infringement, as before stated, is admitted. The letters patent themselves are evidence—prima facie evidence, it is true, but none the less evidence—to support a finding of validity. This evidence in a case of this kind is of more than formal value. The patented thing pertained to a most important art. The claims of the patent would in consequence at once challenge the exercise of the discriminating judgment of the experts in the patent office. More than that, the basis of the denial of validity is the common knowledge which was in the keeping of any one with any pretense of familiarity with metallurgical science.

The Patent Office, therefore, had before it all that we have before us, and the minds which passed upon this question were minds which were trained to an appreciation of everything which pertained to this domain of science and to this art. The judgment then rendered must be regarded with more than a passing or merely formal respect. The defendants necessarily assume the burden of convincing us that the judgment then rendered was a wrong judgment and should be reversed. No one could easily assume the responsibility of deciding in a case of this kind and upon a question of this character that the experts in the Patent Office reached a wrong judgment upon questions which are peculiarly questions to be determined by those having a knowledge of this science and art, unless the person, reviewing the decision reached, finds himself to be a master of the subject.

What was passed upon, among other things, was that of whether the patentee had made any advancement in the art, whether his description of what he thought he had discovered was so set forth as that the thought could be grasped and comprehended, and whether the thing which was the subject-matter of the patent applied for was of any utility, and more particularly whether the applications and claims of the two patents so overlapped that they partook of the vice of double patents.

In a peculiar sense and to an unusual degree, these were all questions which the experts of the Patent Office are qualified to determine, and we do not care to take the responsibility of finding that they have reached a wrong decision, even if it be true that the conclusions reached by them differ from those which would have been reached by us, if the case had been one of the first impressions. Fortunately for all concerned, the law provides a means, to which resort will doubtless be had, for having the questions raised determined in accordance with sound principles of law and in the light afforded by a full knowledge both of the science and the art which bear upon these questions.

A frank avowal might as well be made of the view we have taken of this case. There is a homely saying to the effect that "the proof of the pudding is in the eating." The Carnegie Steel Company may be credited with an epicurean taste. This viand was eaten and most surely relished by them, for they paid $275,000 for the repast. More than that, after they had voluntarily paid this not inconsiderable sum for a very small portion of the dish, and indeed after the present controversy had arisen, they came back and asked for more, practically inviting the caterer to put his own price upon it. It may be, of course, that the food supplied had no food value, and was not even palatable; but any tribunal which made such a fact finding ought to be pretty sure of is ground.

We wish to be understood as having clearly in mind that the fact, even if it be the fact, that the highly trained and competent patent experts who were acting for the Carnegie Company thought these letters patent to be valid, is no ground for a judicial finding of validity. The fact is not even legal evidence upon the issue of validity (except in respect to one feature), and we so rule.

It would be idle, however, for any one to attempt to persuade himself that the fact would not influence his judgment. It has influenced the trial judge in this case, and most strongly impressed him. This confession is not needed, but the defendant has the right to have it frankly made. The plaintiff, on the other hand, has the right to the finding, which is made, that in all features of the case (except one) we have excluded this fact from judicial consideration. Practically, however, and unavoidably, it has had at least the weight which is attached to the opinion of some one whose opinion is of value, when we find that opinion to either confirm or be in conflict with our own. It induces us, if it differs, to do what is our duty to do anyhow, make sure that we are right in the opposite view taken. There is another popular saying which has a bearing. The saying is, "Money talks."

We apologize for being guilty of the offense against good taste which it usually is of quoting verse in a judicial opinion, but we have the authority of Byron for the statement "that most men, until by losing rendered sager, are willing to back their opinions with a wager," and the Carnegie people backed theirs with $275,000. This goes at least to their sincerity. The exception noted is to the utility feature. No objection was interposed to the evidence. We assume this was because commercial acceptance is evidence of utility.

A decree finding the validity of the claims in issue and infringement, and sustaining the plaintiff's bill, except to the extent to which the plaintiff's rights are affected by the agreement between it and the Carnegie Steel Company, may be submitted. In order that the date of the decree entered as a final decree for appellate purposes may be made definite, no decree is made until a formal decree shall have been filed in accordance with the findings above made. The decree submitted may carry the usual features, including costs to the plaintiff.