**Russell C. BUNTING, Plaintiff-Appellant,**

v.

**McDONNELL AIRCRAFT CORPORATION,**
now McDonnell-Douglas Corporation,
Defendant-Respondent.

No. 58783.

Supreme Court of Missouri,
En Banc.

April 14, 1975.

Mogab, Hughes & Green, Richard L. Hughes, St. Louis, Mo. and James F. Hespen, St. Louis, Mo., for plaintiff-appellant.

Robert G. Brady, Robert F. Scoular, Michael B. McKinnis, St. Louis, Mo., for respondent; Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel.

PER CURIAM:

Upon application of defendant-respondent, this cause was transferred to this court from the Court of Appeals, St. Louis District, after the filing of an opinion therein. The same has been re-argued and submitted in this court, and we approve and adopt as our own the opinion heretofore written by Simeone, J., which, without the use of quotation marks, is as follows and identified as Part I hereof.

*Part I*

This is an appeal by plaintiff-appellant, Russell C. Bunting, from an order of the circuit court of the City of St. Louis entered December 11, 1972, sustaining defendant-respondent's "motion to dismiss for want of subject matter jurisdiction," filed October 12, 1972.

This litigation has had a long and complex history. It began by the filing of a petition by Bunting on December 23, 1966, in which he sought damages for an alleged breach of contract. Innumerable sets of interrogatories and answers thereto were filed by both parties, requests for admissions of fact were filed and answered, numerous motions, pleadings, amended petitions and answers thereto were filed. Finally on January 18, 1971, Bunting filed what is denominated his "Third Amended Petition" (actually it is the fifth amended petition) seeking damages for an alleged breach of contract against McDonnell.

The "Third Amended Petition" was in three counts. The petition alleged in the first count that Bunting was employed by McDonnell on or about March 1, 1955, and that as a condition of his employment, signed an "employment contract"[1] which provided any invention made by him would "become the property of MAC." That as a part of the employment contract, Bunting had the benefit of a "patent compensation plan" which provided that "[a]ll inventions conceived by me . . . during the term of my employment and within six months thereafter . . . shall be disclosed to and become the property of the company, and I shall assist in vesting good title in McDonnell Aircraft Corporation in obtaining patents. . . ." One of the provisions of the compensation plan provided for compensation to the employee from the "sale or licensing" by MAC. The compensation plan provided that initially all gross revenue derived from "sale or licensing of assigned patents" shall first be applied to reimburse MAC for its costs in connection with the invention, and thereafter the employee "will be granted a percentage of the remaining net income on the following scale: . . . in excess of $2,000. . . . 10%." The plan also provided that if "MAC does not sell or license the patent, so that there is no ascertainable net income: An award up to $1,000 . . . may be granted on approval by the President of MAC" and "A larger award may be granted on approval of the Board of Directors."

Bunting alleged that under the plan he "was to receive ten percent (10%) of all net income received by the defendant in excess of Two Thousand Dollars ($2,000.00) from the use, slae [sale?] or licensing of said patents."

On or about April, 1960, while employed by McDonnell, Bunting conceived and re-

---

1. The pertinent provision stated, "In consideration of the adoption by McDonnell Aircraft Corporation (MAC) of a patent compensation plan for the benefit of MAC personnel, I agree that all inventions relating directly or indirectly to the business or research of MAC as existing at the date of conception or first actual reduction to practice thereof, including apparatus, machinery, and manufacturing processes usable in connection therewith, conceived or first actually reduced to practice, solely or jointly by me during my employment and within six months thereafter, shall be disclosed to and become the property of MAC, and I shall assist in vesting good title in MAC and in obtaining patents, renewals, reissues and extensions thereon. I have not made any such inventions prior to the date of my employment at MAC except the following, a complete disclosure of which is attached hereto (if none, so indicate) . . . NONE X."

duced to practice "an optical viewing system with polarized beam-splitting element" used in high range data recording cameras and direct radar scope cameras which is standard equipment in airplanes manufactured by McDonnell. Application for patent on the invention was filed with the United States Patent Office on August 14, 1961, and a patent, No. 3,252,375, was issued to "Russell C. Bunting . . . assignor to McDonnell Aircraft Corporation. . . ." on May 24, 1966.

On July 28, 1961, prior to the issuance of the patent, Bunting assigned and transferred "unto the said McDonnell Aircraft Corporation the whole right, title and interest in and to the said invention . . ." and, "I do hereby authorize and request the Commissioner of Patents to issue the said Letters Patent to the said McDonnell Aircraft Corporation as the assignee of my entire right, title and interest in and to the same, for the sole use and behoof [sic] of the said McDonnell Aircraft Corporation."

The petition filed by Bunting alleged that "although plaintiff has performed all of the conditions precedent [sic]" McDonnell has breached the contract with plaintiff by manufacturing, using and "allowing" Conductron Corporation of Missouri (a division of McDonnell) among others, to use, practice and sell the invention without charging a reasonable licensing fee and without paying Bunting ten percent of such reasonable licensing fee. McDonnell, it is alleged, refuses to pay all or any part of any reasonable licensing fee; that a reasonable value of license fees amounts to $1,400,000.00, and that Bunting is entitled to ten percent thereof.

Count II alleged at the time Bunting assigned his invention to McDonnell in July, 1961, a contract existed between McDonnell and the United States wherein McDonnell allegedly agreed to allow the Government to use and practice the invention without payment of a license fee which McDonnell asserts as a bar to Bunting's right to receive income. Although McDonnell was aware of the existence of this contract with the United States, and allegedly had a duty to disclose the existence of such contract to Bunting, it failed to do so and its failure "in this regard was fraudulent and done with the intent to deceive plaintiff. . . ." [2]

Bunting alleged therefore that as a result of McDonnell's failure to disclose the pre-existence of its agreement with the United States, the United States has not paid any fee for the use of the patent all to the damage of Bunting.

Count III alleged unjust enrichment on the part of McDonnell at the expense of Bunting by the use of the patent without paying or receiving a reasonable licensing fee.

The gist of Bunting's petition therefore is that while Bunting is entitled to ten percent of a reasonable licensing fee for the use of his invention under the "Patent Compensation Plan," and although McDonnell under its agreement with the United States that the Government may use the

2. McDonnell asserts that the beam-splitting device was invented in connection with contract No. 60-0134-r entered into in 1959 and with the development of aircraft for the Government. Under Government regulations relating to Government contracts McDonnell is required to "grant to the Government an irrevocable, nonexclusive, nontransferable, and royalty-free license to practice, and cause to be practiced by or for the United States Government, throughout the world, each Subject Invention in the manufacture, use and disposition according to law, of any article or material, and in the use of any method."

On March 5, 1963, two years after Bunting assigned his invention to McDonnell, McDonnell granted a "Confirmatory License" to the United States. The License granted a "non-exclusive, irrevocable, non-transferable, royalty-free license to practice, and cause to be practiced for the GOVERNMENT, throughout the world, in the manufacture, use, and disposition according to law, of any article or material, and in the use of any method, each invention disclosed in the following: Title: Beam Splitting Device. . . ."

invention without fee, and although no sale or license fees have been received by McDonnell for the practice of the invention, nevertheless Bunting is entitled to ten percent of a *reasonable* license fee.

After answer to this petition was filed generally denying the allegations, McDonnell, on October 12, 1972, filed its motion to dismiss for want of subject matter jurisdiction. This motion alleged that "pursuant to Rule 55.31 [55.27], Missouri Rules of Civil Procedure [V.A.M.R.], defendant respectfully moves that the Court dismiss this action on the ground that this Court has no jurisdiction over the subject matter of the action because exclusive jurisdiction is in the Court of ·Claims pursuant to 28 U.S.C. § 1498." On December 11, 1972, the court sustained this motion to dismiss. Bunting then filed his motion to vacate and set aside the order of dismissal and his alternative motion for leave to file an amended petition. This motion was overruled on March 1, 1973, and Bunting duly and properly appealed to this court.

Appellant Bunting, in his brief and in oral argument, urges three points: (1) that the court erred in holding that the dispute was cognizable in the Court of Claims since that court has jurisdiction only where ownership interests in patents are disputed; (2) the court erred in "directing a verdict" [sic] because the Court of Claims does not have jurisdiction since Bunting has never been the *owner* of *any* interest in the patent, and (3) Bunting is entitled to a "directed verdict"· on the issue that under the Patent Compensation Plan Bunting is entitled to receive a percentage of "a Licensing Fee."

McDonnell, on the other hand, urges that the trial court correctly found that it did not possess jurisdiction over the subject matter of this action because exclusive jurisdiction is vested in the Court of Claims pursuant to 28 U.S.C. § 1498, and because this cause of action is actually a suit against the United States which is authorized by § 1498; and (2) Bunting is not entitled to a "directed verdict" on the issue that he is entitled to receive a percentage of a licensing fee because that question was not presented to the trial court.

At the outset it would be helpful to determine what is and what is not before us. While the parties have raised a number of oblique issues, we believe that in the present posture of this appeal there is only one issue that must be determined. McDonnell filed its motion to dismiss the petition for want of subject-matter jurisdiction; the trial court sustained that motion; therefore, the sole issue for our determination is whether the circuit court has jurisdiction to determine this action filed by Bunting or whether it lacks jurisdiction because exclusive jurisdiction lies in the United States Court of Claims. The parties have raised other issues: (1) whether the petition states a claim for relief under the facts alleged for breach of contract although McDonnell receives no· licensing fees for the use of the invention, (2) whether the contract entered into between McDonnell and the United States in 1959, 60–0134–r, and the granting of a royalty-free license to the United States is a defense to the action filed for the alleged breach of contract so that a reasonable license fee is due Bunting regardless whether McDonnell received compensation from the sale or licensing of the patent, (3) whether McDonnell owed a duty to disclose the provisions of the contract with the United States and the confirmatory license when such contract was entered into prior to the assignment on July 28, 1961, by Bunting to McDonnell.

These are issues that are not properly before us and have not been determined by the trial court, and are not a part of this appeal.

Hence, we must determine only whether the trial court erred in dismissing the petition after McDonnell filed its motion to dismiss "for want of subject-matter jurisdiction." §§ 478.070, 482.090, RSMo 1969, V.A.M.S.

McDonnell strongly urges that the court was correct because 28 U.S.C. § 1498 vests exclusive jurisdiction of this cause filed by Bunting in the Court of Claims and because the action is in reality a suit against the United States which "unless permitted by 28 U.S.C. § 1498 is prohibited by the Doctrine of Sovereign Immunity."

■ This is not a patent infringement action. Taking the allegations of the petition as true, as we must on a motion to dismiss, the action is one for an alleged breach of the "Patent Compensation Plan" incorporated by reference in Bunting's employment contract which he signed in March, 1955. Viewing the petition in that light, we must determine whether 28 U.S. C. § 1498 precludes the State of Missouri from entertaining jurisdiction of the cause. McDonnell insists that Bunting's sole remedy is against the United States "for the recovery of his reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a).

Resolution of the sole issue presented hinges upon the interpretation and application of 28 U.S.C. § 1498. That section provides:

"(a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the *owner* thereof or lawful right to use or manufacture the same, the *owner's* remedy shall be by action against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture." (Emphasis supplied.)

■ This section has a long and involved history. It was passed as an amendment in 1918. The Supreme Court had held that a government contractor was not protected from liability from infringement when it used an invention for the United States, Cramp & Sons Ship & Engine Bldg. Co. v. International Curtis Marine Turbine Co., 246 U.S. 28, 42, 38 S.Ct. 271, 62 L.Ed. 560 (1918), and "as a result of that decision, contractors were hesitant to enter into broad procurement contracts for the government, with the possibility of being sued for patent infringement, and wartime procurement was being hindered. The Navy Department thereupon requested that the Act of 1910 be broadened so as to protect government contractors against such [infringement] suits." Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 149 (4th Cir. 1949); Irving Air Chute Co. v. United States, 93 F.Supp. 633, 635, 117 Ct. Cl. 799 (1950). The history of the amendment is fully set forth in Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303 (1928). Its primary purpose was to protect and relieve contractors from any liability for infringement by the owner when an invention was used by or manufactured for the United States. Bereslavsky, supra. The United States in such situations consented to be responsible to the owner and consented to be sued for any possible infringement in the Court of Claims. "The purpose of the amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent and his assigns . . . to suit against the United States in the Court of Claims for his reasonable and entire compensation for such use and manufacture." Richmond Screw Anchor Co. v. United States, supra, 275 U.S. at 343, 48 S.Ct. at 197. See also discussion in 60 Am.Jur.2d, Patents, §§ 498–504 (1972) and 32 Am.Jur.2d, Federal Practice and Procedure, § 438 (1967).

■ This was the purpose of the statute. It was to protect a contractor from liability for infringement of a patent when the contractor manufactured anything for the United States. In such instance the owner's sole remedy was against the United States and the United States consented to be sued for any such infringement. In the course of interpreting the statute, "owner" was given a broad meaning.

Owner means a person who has an interest in the patent as without the statute would support a suit against a defendant other than the United States and does not necessarily mean the owner of the entire rights in the patent. It means a person who has at least such an interest in the patent as without the statute would support a suit against a defendant other than the United States. E. W. Bliss Co. v. United States, 253 U.S. 187, 191–192, 40 S.Ct. 455, 64 L. Ed. 852 (1920). Therefore, it has been held that an exclusive licensee is an owner in the sense that the word is used in § 1498. Wing Engineering Corporation v. United States, 151 F.Supp. 314, 138 Ct.Cl. 260 (1957). And where an entity was not the owner of record of the patent, but only a claimant thereto, the plaintiff was precluded from maintaining suit for infringement in the Court of Claims. N. V. Montan Export-Metaal etc. v. United States, 102 F.Supp. 1016, 122 Ct.Cl. 42 (1952).[3]

■■ Viewing the purposes of the statute relied upon and the interpretations given to it, we do not believe it to be applicable to the facts of this cause. We do not believe that the statute was designed to cover this situation which involves an action for an alleged breach of contract brought by the patentee against his assignee. In 1961 Bunting assigned all of his rights, title and interest to the patent to McDonnell. This he had the right and power to do. Title 35, U.S.C. § 261 provides, "Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing . . . An assignment . . . shall be void . . . unless it is recorded in the Patent Office. . . ." When such an assignment is made, it " 'divests the inventor of his rights as though the invention were a chattel [and] he is bound to leave the assignee free to deal with the invention as he wills.' " New Era Electric Range Co. v.

Serrell, 252 N.Y. 107, 169 N.E. 105, 106 (1929). "If a patentee assigns his patent, title vests in the assignee; and title carries with it the right to sue infringers." Sweetwater Rug Corp. v. J. & C. Bedspread Company, Inc., 198 F.Supp. 941 (S. D.N.Y.1961).

■ Patents and invention rights have the attributes of personal property and are assignable in writing. A written agreement which conveys to the transferee the exclusive right to make, use and sell the invention is an assignment of all interests therein. Kenyon v. Automatic Instrument Co., 160 F.2d 878, 882 (6th Cir. 1947); Doherty Research Co. v. Vickers Petroleum Co., 80 F.2d 809, 812 (10th Cir. 1936); Universal Winding Co. v. Gibbs Machine Co., 179 F.Supp. 394, 398 (M.D.N.C.1959). Such an assignment has been described as a transfer of "all substantial rights of value in the patent." Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1010, 180 Ct.Cl. 1071 (1967). Such a transfer of rights to a patent is valid even if the invention is assigned before the patent issues. Lamar v. Granger, 99 F.Supp. 17, 36 (W.D.Pa.1951). After such transfer the assignor is without capacity to bring an infringement action against anyone. Green v. LeClair, 24 F.2d 74, 77 (7th Cir. 1928).

■ Upon the assignment, Bunting divested himself of all interest and title to the invention and McDonnell became the "owner." The assignment conveyed the exclusive right to make, use, and vend the entire invention, and therefore we hold McDonnell became the "owner" within the meaning of § 1498.

The instant action is not one against a contractor using an invention in manufacturing items for the United States for infringement of a patent in which case the sole remedy would be in the Court of Claims, but is an action for an alleged

---

3. Bunting cites this decision as being "exactly the situation here." It is not since the plaintiff in Montan was the *assignee* attempting to bring suit in the Court of Claims and was not the record owner of the patent because his assignment was not recorded in the patent office.

breach of contract brought by the patentee-assignor against his assignee.

Not every case involving a patent is within the exclusive jurisdiction of the federal system. The general rule is that where a suit is brought upon a contract of which a patent is the subject matter, the case arises on the contract and not under the patent laws, and the fact that the subject matter of the agreement involved patents does not sustain federal jurisdiction. 28 U.S.C. § 1338; Tjaarda v. Briggs Mfg. Co., 121 F.Supp. 189 (E.D.Mich.1954); Reddi-Wip, Inc. v. Lemay Valve Co., 354 S.W.2d 913, 919 (Mo.App.1962); see Wade v. Lawder, 165 U.S. 624, 627, 17 S. Ct. 425, 41 L.Ed. 851 (1897).

McDonnell contends that Bunting's suit must be against the Government pursuant to § 1498, and while nominally the suit is against McDonnell, it is in reality against the United States. This would be true if Bunting's claim as owner was for infringement of the patent by a contractor. But his claim is based on allegations of an alleged breach of contract by the assignee, and we do not see how, under the allegations of the petition his suit is against the United States. McDonnell places strong reliance on Evans v. McDonnell Aircraft Company, 270 F.Supp. 778 (E.D.Mo.1967) vacated on other grounds, 395 F.2d 359 (8th Cir. 1968). But that decision is not controlling. There the patentee-owner sued for infringement of a patent where the material was being used for the United States. The court properly held, under the facts of that case, the sole jurisdiction lay in the Court of Claims. That is not the situation here.

Bunting requests this court to grant him a directed verdict on the issue that under the Patent Compensation Plan he was to receive a percentage of a licensing fee. He contends the issues are clear, the amount of sales is clear, the damages are clear, and hence he is entitled to a directed verdict. This we cannot do. This was not presented to or determined by the trial court. A point not raised in the trial court may not be raised on appeal, and a party cannot request relief on appeal not sought in the trial court. Rule 79.03; State v. Keiter, 394 S.W.2d 399, 401 (Mo. 1965).

While there are many complex and involved issues in this protracted litigation, we are confronted with and rule on the only one before us—that the circuit court erred in dismissing the petition for want of subject matter jurisdiction.

### Part II

In this court, defendant filed an additional brief wherein it is now contended that (1) the United States is a "necessary and indispensable party" and (2) that such a "fatal defect in plaintiff's action cannot be cured by reason of the doctrine of sovereign immunity." The Court of Appeals did not have an opportunity to consider the two points as now posed, for the argument in that court was premised on the idea that ". . . this is actually a suit against the United States . . ." That court, as noted in Part I, properly ruled that plaintiff's cause of action is one solely against the defendant, i.e., a breach of contract suit between plaintiff as patent assignor/employee and defendant as patent assignee/employer. Can the same be litigated and resolved between the only parties to the contract?

Rule 55.27 (g)(2), in part, provides: ". . . a defense of failure to join a party indispensable under Rule 52.04 . . . may be made . . . on appeal" for the first time; and, we consider whether or not the United States is an indispensable party to this litigation. If it is not, any question as to sovereign immunity becomes moot.

The pertinent provisions of Rule 52.04 follow:

(a) Persons to be Joined as Feasible. A person shall be joined in the action if (1) in his absence complete relief cannot

be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant.

(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a) (1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

As the rule is written, part (b) is not activated unless a potential party to the suit fits the requirements of part (a).

■■■■■ Case law contains considerable discussion about what is a necessary and indispensable party, but two examples should suffice. In Ray v. Wooster, 270 S. W.2d 743 (Mo.1954), l.c. 753, the court announced the rule to be that: "[i]n an action on a contract by one of the parties thereto, the only parties defendant who may be necessary are the other parties to

the contract sued on, and those who have an interest in the dispute which will be affected by the action." In State ex rel. Knight Oil Co. v. Vardeman, 409 S.W.2d 672, 677 (Mo. banc 1966), the court said: "We next consider whether the presence of Associates was essential to a 'complete determination of the controversy.' We note, first, that 'the controversy' means the suit between the relator and the Bank, not some other controversy between one of the parties and an outsider. While the intervention cases are not specifically in point, their definitions of an 'interest' which compels intervention are persuasive. In State ex rel. State Farm Mutual Auto Ins. Co. v. Craig, Mo.App., 364 S.W.2d 343, 95 A.L.R.2d 1321, the court said, loc. cit. 346: 'The petitioner for intervention must have an "interest" in the subject matter of the action. Such interest does not include a mere, consequential, remote or conjectural possibility of being in some manner affected by the result of the original action. It must be such a direct claim upon the subject matter of the action that the intervenor will either gain or lose by direct operation of the judgment to be rendered. . . .'" The results reached in the cases cited by defendant are consistent with the two cases noted.

■■■■ This is a lawsuit on a contract between the only two parties who executed the same. The United States need not participate in the resolution of the dispute which has arisen as to the rights of the parties therein. This is true, even though it might become necessary for the court to decide what, if any, effect the provisions of the earlier contract between defendant and the government had on the contract between the instant parties. Any interest of the United States in this litigation is such a remote possibility, that Rule 52.04 does not call for compulsory joinder.

The judgment is reversed and the cause is remanded.

All concur.