UNIVERSAL WINDING COMPANY,
Plaintiff,

v.

GIBBS MACHINE CO., Inc., and Robert
A. Gibbs, d/b/a Gibbs Machine Co.,
Defendant.

UNIVERSAL WINDING COMPANY,
Plaintiff,

v.

Joseph F. SMITH, d/b/a Mechanical Spe-
cialty Co., Defendant.

UNIVERSAL WINDING COMPANY,
Plaintiff,

v.

MADISON THROWING COMPANY, Mac-
field Industries, and Nylon Process-
ing Co., Defendants.

Civ. A. Nos. C-90-G-58, C-91-G-58,
C-235-G-58.

United States District Court
M. D. North Carolina,
Greensboro Division.

Dec. 24, 1959.

Robert F. Conrad, Washington, D. C., and A. L. Meyland, Greensboro, N. C., for plaintiff.

David Rabin, Greensboro, N. C., for defendants.

JOHNSON J. HAYES, District Judge.

1. In these three cases a motion to dismiss for want of an indispensable party has been made by each of the defendants in the above cases. Warren A. Seem, Nicholas J. Stoddard, Fred Tecce and Harold P. Berger, co-partners, doing business under the name of Permatwist, had pending in the United States Patent Office applications for the issuance of patent bearing numbers: 401,-803; 401,951, and 401,952, upon which U. S. Letters Patent No. 2,803,105 has been granted by the United States Patent Office. The partnership above referred to will hereinafter be referred to as Permatwist without calling the names of the individual partners, and the Universal Winding Company will hereinafter be referred to as Universal.

2. On the 14th day of December, 1954, a written contract was entered into between Permatwist and Universal, comprising 19 pages, with a one-page exhibit attached and made a part thereof. The construction of this contract is necessary in the determination of whether Permatwist is an indispensable party in the three suits named above. It is the contention of the defendants that it is an indispensable party and Universal contends that it is not. Permatwist is not within the jurisdiction of this court and has not seen fit to come in voluntarily and make itself a party, and it has been stated by counsel for the plaintiff that Permatwist is not willing to come in voluntarily and become a party plaintiff.

3. If Permatwist by its contract of December, 1954, parted with all of its right, title and interest in and to the application, including the patent issued thereon, then it would not be an indispensable party. The defendants contend that the contract between the parties shows clearly that at most Universal is only an assignee to make and sell and license for use the devices and processes embodied in the applications and patent. The plaintiff, on the other hand, contends that Universal acquired the absolute title to the applications and patent issued thereon and that the contract between the parties merely covers the mode and amount of compensation which Universal would pay.

In the margin [1] pertinent portions of the 1954 contract are set out.

1. In the first part of the 1954 contract it is recited that "Universal is engaged in the manufacture of machines used principally in the textile industry, and whereas Universal desires to purchase from Permatwist and Permatwist is willing to

Three written documents deal with the subject matter; the over-all contract of December, 1954, the assignment of the patent in 1956, and the supplemental

sell to Universal all of their rights to the said patent applications presently filed in the U. S. Patent Office with respect to the processes and apparatus for the production of crimped—yarn and for other thermal processing; including all of their right, title and interest in, of and to, said applications, including license agreements between Permatwist and various third parties for the use thereof,—and all other rights and interests pertaining thereto, upon the terms and conditions hereinafter set forth."

In Covenant 1 Permatwist is sole owner of the processes and apparatus for producing crimped—yarn and further describes the "invention"; then describes the three pending applications; that they have the sole right to sell, transfer and assign the said "invention" and the patent application; that no liens or claims against the same to reduce the interest of Permatwist to less than sole ownership; they are the licensor in license agreements later specifically referred to, free from any adverse claims.

Covenant 2 describes the transaction as follows: "That Permatwist does hereby sell, assign, transfer and set over unto Universal, all of its right, title and interest in, of and to the patent applications—with respect to said 'invention' and any other patent applications that may be filed with respect to said 'invention', together with all claims thereunder heretofore filed and that may be filed hereafter—; together with all patents granted on said patent applications—or thereafter granted on future applications relating to said 'invention', including:

"(a) All of its right, title and interest in, of and to the processes, apparatus and yarns (heretofore described as the 'invention') ;

"(b) All of its right, title and interest in, of and to the license agreements made by Permatwist to the list attached as Exhibit 'A'. Universal hereby assumes all of the obligations of Permatwist under the terms thereof;

"(c) All other rights and interests with respect to said 'invention' and the patent applications thereunder. Permatwist covenants that they will execute and deliver to Universal such transfers, assignments, bills of sale and other documents as may be required to effectuate the provisions of this paragraph."

In Covenant 3 Universal agrees to pay to Permatwist, as the full purchase price thereof, as consideration of the transfer made in Paragraph "2", to be calculated

in accordance with the provisions of this paragraph:

A. Meaning of terms.

B. Purchase price and calculation thereof.

(a) Universal shall pay to Permatwist one-half of the sum of the following, in the amounts, at the times and for the period hereinafter provided:

i. License fees—received by Universal —for the production of crimped yarn— under the provisions of Paragraph 2.

ii. The margin above cost from the sale by Universal of the machines, equipment and apparatus manufactured—by Universal for the production of crimped—yarn, involving the use of the processes— transferred and assigned to Universal under the provisions of paragraph "2".

iii. The margin above base cost, as hereinafter defined, from the sale by Universal of the machines—manufactured by Universal—for the production of crimped yarn.

Proviso:

Provided,—there shall be deducted from the above, before the calculation of the purchase price to Permatwist, the following:

i. The expenses of Universal in the prosecution of the patent applications— assigned to Universal and any patent applications covering any improvement therein, additions thereto or variations thereof.

ii. The expenses of any litigation instituted by Universal against infringement—.

iii. The expenses of defending any suit instituted against Universal or its licensees—

(b) That the share of Permatwist amounting to one-half thereof—shall be paid by Universal to Permatwist in the following manner:

i. That upon the execution of this agreement, Universal shall forthwith pay to Permatwist the sum of $100,000.00 as an advance upon the purchase price—

ii. That thereafter and until Permatwist shall have received the additional sum of $400,000.00, less one half of total expenses described in Sections i, ii and iii of the Proviso, Universal shall pay to Permatwist, as part of the purchase price herein, all of the royalties received by it from licensees in Exhibit A, plus one half of all other amounts set forth in paragraph "(A)" of this subdivision "B".

iii. That thereafter, and until Universal receives an amount equal to that

contract of October, 1958. They deal with the "invention" owned by Perma- twist, the pending applications together with any patent issuing thereon or on

received by Permatwist (including the refund of its advance of $100,000.00), Universal shall pay to Permatwist as part of the purchase price herein, one-quarter of all the amounts set forth in Paragraph (a) of subdivision "B". It is the intent and purpose of this paragraph that payment to Permatwist—shall continue until the total amounts received by Universal shall equal the total amounts received by Permatwist.

iv. Thereafter Universal shall pay to Permatwist one-half of all amounts received by it under—paragraph (a) of subdivision "B", after deduction of the expenses listed in the Proviso.

(c) Quarterly payments.

(d) Definition of "Margin above base costs."

C. Calculation of "Margin above Base Cost"

(a) Fixes cost of $35.00 per spindle;
" " " 28.00 attachment

No change except by the agreement of the parties in writing. The base costs hereinabove fixed are for the purpose of fixing the margin above base cost under the provisions of Paragraph "B." Said machines and attachments shall be sold only by Universal when accompanied by a royalty—for the limited license to use the said machines and attachments for the production of crimped—yarn.

The selling price shall be fixed at $75.00 per spindle; the attachment at $68.00 per spindle.

D. Agreement upon Royalty Basis.

(a) Universal agrees that its licensees shall pay the fixed rate of 25¢ per pound for 70 denier yarn.

(b) Universal agrees that any license agreements which it enters into for other thermal processing—under the patent applications herein sold and transferred under Paragraph 2 hereof shall be fixed at such rate per pound as it shall determine, but not less than 10¢ per pound.

(c) Relates to price of spindle, not to exceed $28.00.

4. Both parties covenant and agree on procedures, provisions, terms and conditions in the operation by Universal of the business of licensing users of—processes for the production of crimped yarn:

(a) Universal shall diligently carry on the business of selling the machines, equipment, etc., and the business of licensing others to use the processes herein.

(b) Universal shall render an accounting quarterly and details how it is to be done.

(c) Permatwist has right to examine and inspect the books and records of Universal with respect to sales, and license agreements.

(d) Universal may change equality between number of spindles licensed by it and number sold by it, depending on its judgment with respect to business conditions.

(e) Universal shall make no reduction in selling price of, etc., or in license fees—as herein filed, without written consent of Permatwist, except as follows:

i. With respect to machines and attachments—not in excess of 10% of the selling prices herein fixed.

ii. Royalties to be paid by licensees— not in excess of 5¢ per pound.

In event Universal has made the full reduction herein provided, then Permatwist shall, upon request, discuss with Universal the question of allowing further latitude in the reduction of selling prices and royalties.

(f) Universal is to retain Permatwist's present patent counsel in the prosecution of the patent applications herein transferred and assigned to it,— but shall be entitled to terminate the employments—if deems it desirable to do so.

(g) Members of Permatwist shall disclose to Universal all procedures and "know how" necessary for the efficient use, etc. of the "invention"—cooperate by furnishing licensees assistance, etc.

Transfer and assign to Universal all improvements relating to the invention.

Make the facilities of their affiliated company available to Universal for demonstration to licensees of the processes herein transferred and assigned. In consideration of the foregoing, Universal agrees to grant the affiliate a royalty free license for not to exceed 2200 spindles.

(h) Universal shall diligently prosecute the patent applications herein transferred and assigned and any future applications —shall have due regard to the advice and suggestions of Permatwist. Universal shall have the right to cease when, in its opinion, the expense is not justified. In such event Permatwist shall be entitled to continue the prosecution of such a claim but at its own expense.

(i) That Permatwist is vitally interested in any patent litigation that Universal may initiate involving the validity of any patents issued on the applications sold hereunder—by reason of the fact that this agreement terminates in the event the patents are declared to be

improvements thereafter upon which patents are granted.

The assignment is an absolute transfer and in accordance with the 1954 agreement. The 1958 supplemental contract in no manner alters the substance of the 1954 agreement.

■ It is well settled that the owner of a patent may transfer the entire monopoly to make, use and sell the invention and any transfer of less than the whole monopoly leaves in the patentee such a substantial interest of ownership that he is an indispensable party. Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516. The patent owner, whether in whole or in part, has such an interest therein that its validity ought not to be litigated in his absence. Technical Tape Corp. v. Minnesota Mining & Mfg. Co., D.C., 135 F.Supp. 505.

■ The name applied to the document of transfer is not decisive, but the legal effect of the terms used in the document will determine whether a transfer is an assignment or a license. E. W. Bliss Co. v. United States, 253 U.S. 187, 192, 40 S.Ct. 455, 64 L.Ed. 852. Applying this test to the principal contract, and observing the meticulous care and scope of this lengthy agreement, certain deductions therefrom are inescapable, first of which is the fact that the author of the document was an experienced lawyer thoroughly familiar with patent law who understood patent language and terms. He knew the great distinction between a license and an assignment.

While the terms, "license" and "licensees," are used throughout the agreement in connection with those dealing with Universal with respect to the patent, never is Universal mentioned as a licensee of Permatwist, nor is the agreement mentioned as a license; on the contrary, the name "assignment" is repeated again and again.

The subject matter of the agreement is likewise significant. The invention; the applications thereon pending in the Patent Office, any patents granted thereon or on any improvements thereon resulting in subsequent patents. All of these rights are pointedly included in the agreement.

■ Then the language employed in respect to the above rights which appear in Paragraph 2 presumably mean what they so clearly state: "Permatwist does hereby sell, assign, transfer and set over all of its right, title and interest in, of and to" the invention, the applications and patents granted thereon or any improvement thereon. This language is repeated again in (a), (b) and (c) of Paragraph 2. If, by some magic in construction, we could obliterate the legal meaning of these words of legal import that the "memory of man runneth not to the contrary," the last sentence in the paragraph would still confront us: "That Permatwist covenants and agrees that they will execute and deliver to Universal such transfers, assignments, bills of sale and other documents as may be required to effectuate the provisions of this paragraph." The foregoing language is utterly inconsistent with a li-

invalid. That, therefore, Universal shall not undertake any litigation, etc. on applications herein transferred and assigned by Permatwist to it,—without prior consultation with Permatwist and their prior approval and consent, which shall not be unreasonably withheld.

(j) and (k) not particularly pertinent.

(l) That Universal shall not assign this agreement without the consent of Permatwist except to a successor or purchaser of its going business who shall assume all of its obligations hereunder.

5. Universal agrees that any payments made to Permatwist under—this agree-

ment shall not be recoverable by reason of the failure to secure the grant of patents on the declaration of invalidity of any such patents, if granted, by a court of competent jurisdiction in a final proceeding.

6. This agreement continues during the pendency of the applications and the term of any patents granted.

Provided, it shall terminate if all the patents granted herein are declared invalid by a court of competent jurisdiction from whose judgment no appeal can be or is taken.

cense and can be construed only as an outright sale and transfer of everything —right and interest—pertaining to the invention and to patents granted thereon.

This construction is further buttressed by the terms employed in Paragraph 3: "That in consideration of the transfers made in Paragraph '2' hereof, Universal covenants and agrees to pay to Permatwist, as the full purchase price thereof," —then follows the sums and the method of calculation. It is clear that an assignment and not a mere license is the legal term employed and intended. The court is bound by the language employed in the document if its meaning is clear and unambiguous. It cannot make a contract nor substitute an intention or meaning which does violence to the plain and obvious meaning of words which were obviously employed to express and do express the intention of the contracting parties.

■ The defendants urge that the agreement only conveys the right to make, vend, and to license others to use, thus coming under the doctrine of Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923. There is no merit in this contention. Here the conveying terms include all the interests in and rights to the invention, the applications and patents granted thereon. Conveying the patent carries with it the rights to make, use and vend.

■ When the transferring instrument conveys, as it does here, the entire monopoly, its legal effect is not altered by the obligations imposed upon themselves; it is still an assignment, not a mere license.

■ The subsequent provisions in the agreement by which Universal agrees not to assign its contract without the consent of Permatwist, nor initiate infringement suits without prior approval and consent of Permatwist, "which shall not be unreasonably withheld," are provisions in the nature of safeguarding Permatwist as security for the payment of the purchase price. To say that these clauses converted those already expressed provisions denoting a sale and assignment would result in making a new contract and in destroying the one the parties made. If there are apparent conflicts in the language of an agreement, it is the duty of the court to construe these, if possible, to effectuate a contract. Our interpretation of the contract as an assignment is supported by Green v. Le Clair, 7 Cir., 24 F.2d 74 and Hook v. Hook & Ackerman, 3 Cir., 187 F.2d 52.

In United States v. Washington Institute of Technology, Inc., 3 Cir., 138 F.2d 25, 26, relied on by defendants, the court there held in that particular contract the patentee could control the sale, and could control use; "freely to dispose of what one has is clearly one important element in that collection of rights, privileges, powers and immunities known as ownership." We accept the principles stated but we hold here that these provisions in the contract we are construing are safeguards for the payment of the balance of the purchase price and should not be construed to nullify the plain language and terms of a complete assignment; it is not reasonable to suppose Universal would make a down payment of $100,000 as a part of the purchase price of the invention, etc., if a mere license was all that was contemplated.

An order will be entered overruling the motion to dismiss.