BENJAMIN I. DAVIS AND MOLLIE M. (MYRTLE S.) DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket No. 3557-70.
United States Tax Court
T.C. Memo 1972-235; 1972 Tax Ct. Memo LEXIS 22; 31 T.C.M. (CCH) 1155; T.C.M. (RIA) 72235; November 27, 1972, Filed W. Stuart McCloy and P. K. Seidman, for the petitioners. John B. Harper, for the respondent. DAWSON
MEMORANDUM OPINION DAWSON, Judge: Respondent determined deficiencies in petitioners' *23 Federal income taxes for the years 1966 and 1967 in the respective amounts of $22,402.38 and $65,282.88. The only issue to be decided is whether certain proceeds from the sale of rights to a patent application should be treated as ordinary income under section 1239, Internal Revenue Code of 1954, or should be taxed as capital gains. All of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, are incorporated herein by this reference and are adopted as our findings. The pertinent facts are set out below. Benjamin I. Davis (herein called Davis) and Mollie M. (Myrtle S.) Davis are husband and wife who resided in Ellendale, Tennessee, at the time their petition was filed in this case. They filed their joint Federal income tax returns for 1966 and 1967 with the district director of internal revenue at Nashville, Tennessee. They reported their income on the cash receipts and disbursements method of accounting. Sometime prior to April 22, 1965, Davis acquired by oral agreement from Don Q. Garey (Garey), an inventor, all of that inventor's rights to an invention called an "Apparatus for Skinning Linked Sausages and the *24 Like." The oral agreement was evidenced by a written assignment dated April 22, 1965, which was filed in the United States Patent Office on May 6, 1965. The invention was represented by an application for United States Letters Patent, Serial No. 453,319, dated April 22, 1965, and filed in the Patent Office on May 5, 1965. The invention was further identified in the Patent Office as File No. 65,040. Davis paid Garey $15,000 for the assignment on September 12, 1966. As additional consideration Davis had paid, prior to December 31, 1965, Garey's attorney's fees of $1,055.61 incurred in connection with the patent application. Under the oral agreement between Davis and Garey, Davis was assigned all rights, title and interest to any modification and improvements which Garey might subsequently make on the invention. Garey made improvements in the second assembly which became the final working model between April 22, 1965, and August 10, 1965, the date the final working model was placed in actual commercial production at the Nat Buring Packing Company, Memphis, Tennessee. This model, which was the first assembled production unit, was sold to Nat Buring Packing Company for $3,395. On October 8, 1965, Davis *25 filed a trademark application with the United States Patent Office for the registration of the mark "Ranger IX" for a "Machine for Skinning or Peeling Linked Sausages, Frankfurters, Weiners, and the Like." The Ranger IX name was chosen because of the contemporaneous publicity being given the United States Government Aerospace Ranger Program. Registration of the trademark in the Patent Office on the principal register was granted December 6, 1966. The trademark "Ranger IX" was first used on August 10, 1965, the date the first assembled production unit was sold to the Nat Buring Packing Company. The Ranger IX is a machine invented to meet the needs of the meat packing industry. It peels and removes the nonedible cellulose casing from cooked frankfurters of any size or length in a fast, efficient manner. It is designed to process 12,000 pounds of frankfurters per hour which would otherwise require the employment of 75 persons per hour to handle the same volume. When Ranger IX was first reduced to practice, there were competitive machines on the market attempting to accomplish the same result. As of the date of these proceedings, all but one of these competitive machines have been withdrawn. *26 The one remaining is called a cartridge pack stripper and was developed by and primarily for a large meat packing processor. Ranger claims its machine, the Ranger IX, is more versatile than competitive machines in that it will peel frankfurters of a greater variety of sizes, is more economical to maintain, and is sold at a lower retail price. From August 10, 1965, the date of the first commercial sale of the Ranger IX, to February 2, 1966, Davis operated a sole proprietorship known as Ranger Tool Company, which engaged in the manufacture and distribution of meat packing and processing equipment under the "Ranger IX" trademark at Ellendale, Tennessee. On his 1966 income tax return Davis reported $29,130 in gross receipts from sales of the Ranger IX during January 1966. On February 2, 1966, Davis organized Ranger Tool Company, Inc. (Ranger), a Tennessee corporation, with an authorized capital of 2,000 shares of common stock having no par value. Davis subscribed to all of the common stock, transferring to the corporation assets and cash of his sole proprietorship valued at $50,126.36. The articles of incorporation provide that: The general nature of the business to be transacted *27 by this corporation is to manufacture, produce, buy, sell, distribute and generally deal in and service sausage and meat packing equipment, fixtures, machinery and appliances of all kinds; to apply for, obtain, register, lease, purchase or otherwise acquire and hold, own, use, operate, develop, introduce and sell, assign, grant licenses in respect of or otherwise turn to account or dispose of patents, trademarks, trade names, secret processes and all inventions, improvements and processes used in connection therewith. On March 1, 1966, Davis made gifts of 300 shares of Ranger stock each to his wife and two children. During the years in question the common stock of Ranger was held as follows: Number of
Percentage
Shareholder
Shares
of Shares
Benjamin I. Davis
1,100
55%
Mollie M. Davis
300
15%
Jerry Wayne Davis (son)
300
15%
Eleanor Faye Davis (daughter) 300
15%
Total
2,000
100%
At the time of these gifts of stock, Jerry Wayne Davis was 20 years old and Eleanor Faye Davis was 26 years old. Jerry Wayne Davis was born on April 27, 1945, and reach his majority (age 21) under Tennessee law on April 27, 1966. On March 4, 1966, Davis, his wife *28 and minor son owned more than 80% in value of the common stock of Ranger. On April 27, 1966, Davis and his wife owned less than 80% in value of the common stock of Ranger, his minor son having become of age on that date. The Ranger IX machine was manufactured by Davis as a sole proprietor from August 10, 1965, until February 2, 1966, and after that date by Ranger. It proved to be marketable because of its versatility, its economy of operation and its lower sale price as compared to competitive machines. Therefore, Davis was advised by his accountants and attorneys to sell all of his rights to the invention and all improvements therein to Ranger. At a special meeting of the Board of Directors of Ranger held on March 4, 1966, the sale of the invention, as well as the maximum purchase price thereof, was thoroughly discussed. The minutes of that meeting disclose as follows: The Chairman next announced that the success of the business was dependent in large measure upon the improved design of the company's products and the protection afforded such design by the patent application now pending before the United States Patent Office. He stated that it was important for the corporation *29 to acquire all rights in the design as established by the pending patent application, Serial No. 453,319, together with current modifications in the process of being submitted to the Patent Office, and that he, as the owner thereof, was willing to sell the entire patent to the corporation for its immediate use if a proper value therefor could be agreed upon. Because of the importance of its immediate acquisition by the company, Mr. Davis said that both Mr. Seidman and the company enter into an agreement for the purchase by the company of all patent interests presently held by Mr. Davis and all future patents which would accrue therefrom. Mr. Davis stated that in his opinion the patents have a value of probably $750.00 to $1,000.00 per unit and that the potential market for the apparatus for skinning linked sausage should be approximately 3,000 units. On this basis, Mr. Davis stated that he would be willing to sell and transfer his patents to the corporation for a price of $2,250,000.00, subject to a reduction in such price if an independent appraisal based upon a firm offer to purchase from a reliable company or individual in the industry indicated that the value per unit was something *30 less than $750.00. A discussion was had as to whether or not the purchase price should be stated in terms of a per unit cost or a percentage of sales, but Mr. Davis insisted that a fixed price be attached to the contract so that he might know on the front end what he might expect to receive from this disposition of valuable rights. After a full discussion, the following resolution was unanimously adopted: RESOLVED: That the Directors believe it to be in the best interest of the corporation to acquire by absolute assignment, the unrestricted ownership in and to the patent or patents now pending before the United States Patent Office and covering the design and modifications thereof of the equipment and apparatus now being produced by the company, and in furtherance thereof, hereby authorize the Vice President and Secretary of the corporation to execute a purchase agreement in the name of the corporation for all such patent rights at an agreed price of $2,250,000.00, payable in installments of not less than 10% a year or $750.00 per unit, whichever is the greater amount, and subject to a downward adjustment in purchase price in the event an independent appraisal discloses a value *31 per unit less than $750.00. RESOLVED FURTHER: That an independent appraisal or offer to purchase be obtained in order to establish an independent value for the patent rights and that after a final determination of value, the President and Secretary of the corporation are hereby authorized to file for record in the United States Patent Office a formal shortform assignment reflecting the transaction entered into and approved this date. On March 4, 1966, Davis and Ranger entered into an agreement for the sale of all of Davis' rights, title and interest in the invention. The agreement provided: WHEREAS, Benjamin I. Davis is the owner of the entire right, title and interest in and to a certain apparatus for skinning linked sausage and the like, and in and to application for United States Letters Patent thereon, Serial No. 453,319, filed May 5, 1965, and any patent or patents which may mature therefrom and in and to all rights relative to said invention, including the right to file applications and obtain patents thereon in countries foreign to the United States; and WHEREAS, Ranger Tool Company, Inc., desires to obtain and Benjamin I. Davis to sell, assign and transfer to Ranger *32 Tool Company, Inc., on the terms and conditions set forth herein, all of Seller's right, title and interest in and to said invention and all applications or patents relating thereto. NOW, THEREFORE, in consideration of One ($1.00) Dollar, receipt of which is hereby acknowledged, and of the mutual covenants and undertakings hereinafter set forth, the parties hereto have agreed and do hereby agree as follows: I Seller hereby sells, assigns and transfers to Purchaser his entire right, title and interest in and to said invention and said United States patent application thereon and any patent or patents which may issue therefrom. Seller agrees to cooperate with Purchaser in obtaining patent protection on said invention by signing any necessary papers and performing other necessary acts without compensation in addition to that provided herein, but at the expense of Purchaser. II Seller agrees to assign to Purchaser improvements in the linked sausage skinning apparatus of the type disclosed and claimed in said application, Serial No. 453,319, which he may hereafter make or acquire and which are of the same general type as the devise [sic] disclosed in said application and come *33 within a claim or claims of said application of any patent or patents maturing therefrom. III In consideration of Seller transferring all his right, title and interest in and to said invention, said patent application and any patent or patents which may mature therefrom, Purchaser agrees to pay to Seller the sum of Two Million Two Hundred Fifty Thousand ($2,250,000.00) Dollars, payable in the following manner: On or before December 31, 1966, Twenty-Nine (29%) percent thereof, or Seven Hundred and Fifty ($750.00) Dollars per unit sold, whichever shall be the lesser amount, and for each succeeding calendar year, on or before December 31st thereof, a sum equal to ten (10%) percent of the purchase price of Seven Hundred and Fifty ($750.00) Dollars per unit sold for such year, whichever shall be the greater amount, until such time as the purchase price hereof shall have been paid in full. Each payment made against the principal obligation deferred hereunder until a year subsequent to the year of closing, 1966, shall bear simple interest at four (4%) percent per annum from the date hereof, and any unpaid installment of interest shall itself bear interest at six (6%) percent per annum *34 from the date due. The parties hereto agree that the installment sales provisions of the Internal Revenue Code are intended to apply to the sale herein provided for, and under no circumstances shall the Purchaser pay to Seller in the year of sale, 1966, more than Twenty-Nine (29%) percent of the agreed purchase price above stated. It is further expressly agreed that this agreement of sale and contract shall be nontransferable and nonassignable by Seller, and the promises to pay hereunder shall be nonnegotiable until January 3, 1967. Subject to the foregoing limitations, from and after January 3, 1967, Purchaser shall pay to Seller for the granting of any licenses in the United States and in countries foreign to the United States, for the use of this invention, fifty (50%) percent of the royalties received by it under any license agreement, but in no event shall the purchase price paid to Seller hereunder be less than the amount established in the manner hereinabove prescribed. IV Purchaser agrees to keep and to require its licensees to keep adequate records and accounts showing information necessary for computing payments due to Seller and to permit Seller to inspect such records *35 and accounts at reasonable times during business hours. On December 31st of each year during the continuation of this agreement, Purchaser agrees to furnish to Seller a statement showing the amounts due to Seller in accordance with this agreement for the calendar year to date and to accompany each such statement with a payment of the amounts shown thereby to be due to Seller. V The parties hereto acknowledge that the relationship of Seller to Purchaser requires scrupulous adherence to an independent determination of fair value for the rights herein conveyed. For this reason, the parties agree that within one hundred and twenty (120) days from the date hereof, they shall secure such appraisal and if same shall establish a per unit value for the patent rights herein conveyed of less than Seven Hundred and Fifty ($750.00) Dollars, the parties hereby agree that the purchase price herein provided for shall be adjusted downward proportionately, retroactive to the effective date hereof. Notwithstanding the foregoing, no increase in the agreed purchase price shall result from any appraised value in excess of Seven Hundred and Fifty ($750.00) Dollars per unit. VI Within sixty (60) days *36 after securing the aforesaid independent appraisal, Seller agrees to make, execute and deliver to Purchaser a formal short-form transfer and assignment of his interest in the above described invention and patent application thereon and will cause same to be recorded and entered on the records of the United States Patent Office. VII As security for the full performance of Purchaser's obligations hereunder, Purchaser hereby grants to Seller and Seller expressly reserves a first lien against the invention, United StatesPatent application thereon, and any patent or patents which may issue therefrom all as above described, to the end that should Purchaser fail to make the payments as required hereby or default in the performance of any of its obligations hereunder, and shall fail or refuse to cure any such default within theirty (30) days of written notification thereof from Seller, Seller may cancel and terminate the agreement, cause the interest herein conveyed to be sold at public or private sale, and the proceeds thereof, less the expenses incurred in connection with such sale, to be applied against the balance of payments due from Purchaser hereunder, and if the same shall be *37 insufficient to liquidate such obligation, then to take judgment against the Purchaser for the deficiency. In any such public or private sale, Seller shall have the privilege of purchasing for his own account. VIII This agreement and the rights and liabilities hereunder shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors or assigns of both parties hereto. After the agreement dated March 4, 1966, was executed, Ranger contacted Townsend Engineering Company, Des Moines, Iowa, and requested a proposal for the use of and patent rights to the Ranger IX, including the exclusive rights to manufacture and sell the Ranger IX. In a letter dated June 17, 1966, Townsend Engineering offered Ranger a price of $1,000 per unit for all of the rights to the invention. This offer was not accepted by Ranger. Immediately after this offer was received, a special meeting of the Board of Directors of Ranger was held on June 21, 1966. The offer of Townsend Engineering Company dated June 17, 1966, was presented to the Board, and the purchase price of the patent rights was confirmed without adjustment as required by the agreement of March 4, 1966. The pertinent *38 minutes of this meeting show that: The Chairman announced that the meeting had been called for the purpose of reviewing a written offer to purchase Mr. Davis' patent rights which had recently been received from Townsend Engineering Company, of Des Moines, Iowa, designers and manufacturers of meat packing equipment. Mr. Davis explained that this bona fide offer to purchase patent rights at $1,000.00 per unit manufactured and sold constituted an independent appraisal of the value of the patent rights sold to the company by agreement dated March 4, 1966, which agreement required that such an independent appraisal be made and that if the estimated per unit value of the patent were found to be less than $750.00, then an adjustment in the overall purchase price would have to be made. Mr. Davis stated that because the appraisal indicated a value in excess of that which he had estimated in March, no adjustment in the $2,250,000.00 purchase price would be required. Mrs. Davis suggested that the letter offer from Townsend Engineering Company be filed with the minutes of the meeting and suggested that it would now be appropriate for Mr. Davis to record in the United States Patent Office a *39 short form of assignment to the company in order that record title to the patent might now stand in the company's name. Mr. Davis agreed to call upon the company's attorneys to prepare such a form suitable for filing and to execute same at the earliest possible date. After further discussion, the following resolution was unanimously adopted: RESOLVED: That the purchase price of $2,250,000.00 for the patent rights purchased from Benjamin I. Davis on March 4, 1966, is hereby confirmed by independent appraisal as required by the purchase agreement with respect to said patent rights. Thereafter, an assignment was drafted and executed by Davis on August 30, 1966, assigning all rights to the invention to Ranger. The assignment was filed with the United States Patent Office on September 6, 1966. This assignment was made pursuant to the terms of the March 4, 1966, agreement between Davis and Ranger, in accordance with the minutes of the special meeting of the Board of Directors of Ranger held on June 21, 1966. On September 19, 1966, Garey executed an application for Letters Patent, Serial No. 584,621, as a continuation-in-part of the earlier application for Letters Patent, Serial No. *40 453,319, describing the invention as an "apparatus for skinning a chain of linked sausages and the like," and on the same date executed an assignment thereof to Davis. The continuation application and the assignment were filed in the United States Patent Office on September 29, 1966. All the improvements represented by the application for Letters Patent were reduced to practice on or before August 10, 1965, the date of the sale of the final working model, to Nat Buring Packing Company, Memphis, Tennessee. On January 3, 1967, in a telephone conversation with the United States Patent Office, John Walker, III, patent attorney handling matters for Garey, Davis, and Ranger, was orally informed that if certain conditions were met, a notice of allowance would be issued. The conditions pertained solely to the language used in the application for United States Letters Patent except for the cancellation of claim 5. The conversation was confirmed in writing by the patent examiner on January 19, 1967. The conditions being met on January 27, 1967, notice of allowance of Patent Application Serial No. 584,621 was sent to the attorney. On April 11, 1967, United States Letters Patent No. 3,312,995 *41 were issued on the above applications to Ranger as assignee by mesne assignments from Garey, Bartlett, Tennessee, assignor. Of the 14 claims made on the invention, with improvements, 13 were patented. The Letters Patent stated in pertinent part: The apparatus of the present invention is substantially mechanically simple, with a minimum number of intricate and complicated mechanisms to get out of order; it requires minimum maintenance and adjustment, and is easy to operate. The apparatus performs rapidly, consistently and accurately, and many sausage links or chains can be processed in a given time. In summary, the present invention provides a very practical apparatus for skinning the sausage links of a chain of linked sausages. Ranger, or its predecessor proprietorship, has been the sole manufacturer of the Ranger Peeler. Sales are handled exclusively by Ranger and Townsend Engineering Company, Des Moines, Iowa, the latter receiving a commission based upon the retail sales price established by Ranger. In fiscal 1967, Ranger sold 241 units of the invention; in fiscal year 1968, 116 units. Ranger reported gross receipts and taxable income for the two fiscal years as follows: Fiscal Year
Gross Receipts
Taxable Income
1967
$801,775.00
$281,813.00
1968
559,887.00
170,518.00
*42 In the calendar year ended December 31, 1966, Davis received $164,250 from Ranger in accordance with the agreement dated March 4, 1966. This amount was reported on petitioners' joint Federal income tax return for 1966 as long term capital gain on an installment basis under section 453(b)(1)(B). In the calendar year ended December 31, 1967, petitioner Davis received $225,000 from Ranger in accordance with the agreement dated March 4, 1966. This amount was reported on petitioners' joint Federal income tax return for 1967 as long term capital gain on the installment basis under section 453(b)(1)(B) of the Code. In both of these returns petitioners reported the sale of the patent on the Ranger IX as having occurred on March 4, 1966. Similarly, the depreciation schedule on Ranger's United States corporation income tax return for fiscal year 1967 showed the acquisition date of the patent on the Ranger IX as "March 1966." The issue confronting us is whether, under the above-recited facts, the amounts received by Davis in 1966 and 1967 from the transfer of all of his rights in the patent applications on the Ranger IX sausage skinning device to Ranger Tool Company, Inc., are taxable as *43 ordinary income under section 1239, [1] Internal Revenue Code of 1954, or as long term capital gain. [2]
*44 Respondent argues that section 1239 is applicable to the transaction in question because (1) on the date of the transfer, March 4, 1966, Davis, his wife, and minor son, owned more than 80% in value of Ranger Tool Company's outstanding stock and (2) Davis' patent applications constituted property which in the hands of Ranger, the transferee, was property of a character which is subject to the allowance for depreciation. Petitioners, to the contrary, contend that the sale transaction was not actually closed until after June 21, 1966, when the purchase price was confirmed by Ranger and Davis and his wife owned less than 80% in value of the outstanding stock of Ranger Tool Company. Petitioners also assert that respondent's characterization of the property transferred to Ranger as property of a character subject to the allowance for depreciation is in error. Petitioners first urge that the agreement of March 4, 1966, is executory. [3] As a result, it is argued the sale by Davis to Ranger was not completed until June 21, 1966, at which time he and his spouse owned less than 80% in value of the outstanding stock of Ranger, thus making section 1239 inapplicable to the transfer. Petitioners *45 contend that the agreement of March 4, 1966, merely bound the parties to perform specific future acts, i.e., determine a purchase price for arm's length and installment sales purposes and transfer the property to close the sale. It is our view that this contention should not be sustained. The March 4, 1966, Agreement specifically provides: "Seller [Davis] hereby sells, assigns and transfers to Purchaser [Ranger] his entire right, title and interest in and to said invention and said United States patent application thereon and any patent or patents which may issue therefrom." This same agreement further provides: "The parties hereto acknowledge that the relationship of Seller to Purchaser requires scrupulous adherence to an independent determination of fair value for the rights herein conveyed. For this reason, the parties agree that within one hundred and twenty (120) days from the date hereof, they shall secure such appraisal." [Emphasis supplied.] This language indicates to us that *46 although the agreement permitted the purchase price of $750 per unit to be adjusted downward on the basis of the appraisal to be obtained and the actual execution of the formal short-form transfer and assignment of Davis' interest in the patent application transferred was not to be recorded with the United States Patent Office until after this appraisal was obtained, the intent of the parties was to effect a transfer of the patent rights on March 4, 1966. [4] It is this intent which determines the rights and obligations of the parties and is controlling as to the agreement's efficacy. Deaton v. Vise, 210 S.W.2d 665, 186 Tenn. 364 (1948); Real Estate Management, Inc. v. Giles, 293 S.W. 2d 596, 41Tenn. Appeals Reports 347 (1956); Omar Construction Co. v. Tennessee Central Ry. Co., 375 S.W. 2d 563, 212 Tenn. 556 (1963). *47 Petitioners also argue that the provision in the agreement regarding the applicability of the installment sales provisions of the Internal Revenue Code indicates that the March 4, 1966, agreement remained open. This provision is at best merely a neutral factor. It does not in any way indicate the lack of an absolute transfer. See Rude v. Wescott, 130 U.S. 152 (1889); Boesch v. Graff, 133 U.S. 697 (1890); Green v. LeClair, 24 F.2d 74 (C.A. 7, 1928); Universal Winding Co. v. Gibbs Machine Co., 179 F. Supp. 394 (M.D.N.C. 1959). The second and far more significant question to be resolved is whether the property transferred by Davis to Ranger is property in the hands of Ranger of a character which, under section 1239(b), is subject to the allowance for depreciation provided in section 167. The issue has been examined by this Court on several prior occasions. In Estate of William F. Stahl, 52 T.C. 591 (1969), affirmed in part and reversed in part, 442 F.2d 324 (C.A. 7, 1971), the taxpayer had transferred 8 patents and 5 patent applications to his controlled corporation. Relying upon our previous decisions in *48 Hershey Manufacturing Co., 14 B.T.A. 867 (1928), affd. 43 F.2d 298 (C.A. 10, 1930) and United States Mineral Products Co., 52 T.C. 177 (1969), we concluded that the five patent applications were not "depreciable property" nor "property of a character subject to the allowance for depreciation." On appeal, the Court of Appeals for the Seventh Circuit engrafted certain conditions upon this holding. That Court pointed out that the taxpayer-assignor had received formal notices of allowance from the Patent Office with respect to two of the patent applications transferred and notification that two of the claims presented in a third patent application appeared allowable. The remaining two applications were rejected. The Court of Appeals concluded that the two patent applications as to which official notices of allowance had been received and the application as to which there had been notification that two of its claims appeared allowable "were sufficiently matured applications as to require that they be treated as patents for purposes of section 1239." The Court of Appeals added that ignoring such action was unwarranted and too mechanistic an application *49 of the provisions of section 1239(b). In the instant case the stipulated facts disclose that the first indication from the Patent Office with respect to the allowability of the claims here involved was January 3, 1967, some 10 months after the transfer to Ranger had taken place. Respondent argues that despite the absence of such notification the patent applications were sufficiently matured applications as to require that they be treated as patents for purposes of section 1239. In support of this contention respondent states that the invention was obviously patentable because of its novelty and superiority to competing equipment; Davis' actions in connection with the production and sales of Ranger IX units indicated his recognition that the patent applications would ripen into patents; and, the placing of a $2,250,000 purchase price on the patent applications indicated more clearly than any other action the valuable interest which was being transferred and the virtual certainty that these rights would mature into depreciable patents. Unlike the Stahl case, into whose mold respondent seeks to squeeze this case, there had been no formal or informal notices of allowance regarding *50 these patent applications at the time of the transfer to Ranger. Solely because the patent applications had greatly appreciated in value, as a result of the successful marketing of the Ranger IX during their pendency, respondent would conclude that the issuance of the patents was a virtual certainty. This is not necessarily so. As long as the patent applications were pending and patents could ultimately be issued, Ranger's competitors could copy its machine only if they were willing to risk the costs of tooling up for production which could later be enjoined after issuance of the patents and an infringement suit for damages on further production after such patents were issued. Therefore, while certainly more valuable as a patented invention, Ranger still received, at the very worst, a highly marketable, efficient non-infringing machine with a head start in its industry on the sale of such equipment. Ranger's risk was real. However, since its royalty obligation was on a per unit basis and in favor of one of its principal shareholders it could strike such a bargain where others could not. These peculiar facts do not, however, alter the character of the property transferred. Accordingly, *51 we conclude the patent applications here involved are neither depreciable property nor property of a character subject to the allowance for depreciation nor sufficiently matured applications as to require treatment as such property. See Lan Jen Chu, 58 T.C. 598 (1972). Decision will be entered under Rule 50. Footnotes
1. SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION. (a) Treatment of Gain as Ordinary Income.--In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)-- (1) between a husband and wife; or (2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren; any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. (b) Section Applicable Only to Sales or Exchanges of Depreciable Property.--This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167. ↩
2. Respondent makes no argument that the amounts in issue constitute ordinary income under section 1235, I.R.C. 1954, even though Davis' interest in Ranger Tool Co., Inc., exceeded the requirements contained in section 1235(d). He proceeds here entirely on the theory that the amounts received by Davis are taxable as ordinary income under section 1239. See Lan Jen Chu, 58 T.C. 598, 608↩ (1972), footnote 1.
3. See Williston on Contracts, §14, pp. 27-28, where that treatise indicates all contracts to a greater or less extent are executory. when they cease to be so, they cease to be contracts.↩
4. It is significant with respect to the question of intent that, as candidly mentioned in a footnote contained in petitioners' reply brief, "It is fair to state that on March 4, 1966, the petitioners considered the applicability of section 1239↩ to a non-depreciable asset under the existing law so remote that the age of his minor son was unimportant. The whole issue could otherwise have been avoided by delaying the contract date until April 27, 1966." In this regard we have also considered the petitioners' action in reporting the sale as having occurred on March 4, 1966, on their respective joint Federal income tax returns for 1966 and 1967.